## BRIGGS *v.* UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 722. Submitted January 4, 1892. — Decided February 29, 1892.

During the civil war two citizens of the United States, residing in loyal States could make a valid contract for the sale or mortgage of cotton growing on a plantation within one of the insurgent States, and such a contract would pass existing cotton on the plantation, and also crops to be subsequently raised thereon.

In Kentucky the common law rule prevails that a sale of personal property is complete, and title passes as between vendor and vendee, when the terms of transfer are agreed upon, without actual delivery.

The contract in this case for the sale of cotton growing and to be grown did not come within the statute of frauds, and the only question to be decided is whether it was a contract of sale or a contract of mortgage.

The captured and abandoned property act was a surrender by the United States of its right as a belligerent to appropriate property of a particular kind taken in the enemy's country, and belonging to a loyal citizen.

THE court stated the case as follows :

This is an appeal from a decree of the Court of Claims, dismissing the petition of the appellant, praying judgment for the amount of the proceeds of certain cotton, the property of his testator, which was seized by the forces of the United States and sold and the proceeds paid into the Treasury. The facts of the case, briefly stated, are as follows:

Charles S. Morehead was a citizen of Kentucky at the breaking out of the late civil war. He was a man of distinction in that State, and had once been its governor. He was a lawyer by profession, and before and until the war practised law in partnership with C. M. Briggs. In the spring of 1861 he was the owner of two plantations near Egg's Point, in Mississippi, and at the opening of the war he was on the plantations; but some time in the following May or June, when a prolonged struggle seemed inevitable, he left one of the plantations in charge of an overseer and the other in charge of his son, and returned to Kentucky. Not long afterwards he was arrested and confined in Fort Warren as a suspected rebel, because of his sympathy with the Confederate cause, but, upon taking the oath of allegiance to the United States, he was, in February, 1862, released. On the 18th of April following he sold to C. M. Briggs, his former partner, by a bill of sale in writing, all the cotton on his plantations, baled and unbaled, gathered and ungathered, and all that should be raised in 1862, to satisfy certain indebtedness to him and to secure him for certain debts which he was under obligation to pay for Morehead. The bill of sale was as follows:

"For and in consideration of money loaned and advanced heretofore by C. M. Briggs, and further valuable considerations by way of suretyship for me by said Briggs, I hereby sell and transfer to said C. M. Briggs all the cotton on my two plantations in Mississippi, near Egg's Point and Greenville. Said cotton so sold embraces all that I may have, baled and unbaled, gathered and ungathered. This is intended to cover all cotton that I have now or may have this year on said two plantations, supposed to be about two thousand bales.

"April 18, 1862. C. S. MOREHEAD."

The bill of sale was delivered to C. M. Briggs on the day of its execution, and at the time both parties were citizens and residents of Kentucky.

The agents left in charge of the plantations in Mississippi superintended the raising of cotton on them, and had general direction of the affairs of the plantations in the years 1861, 1862 and 1863. The son of Morehead sold some of the cotton in order to obtain money to carry on the plantations, and some of the sales were made to an agent of the Confederate government; but it does not appear that Morehead gave any directions to his agents as to the disposition of any of the cotton, or had any communication with them in 1862 or 1863.

None of the cotton belonging to Morehead which was on the plantations at the time of the sale to Briggs came into the possession of the United States; all that came into their possession was raised subsequently. In 1862, after the sale, the agents left in charge of the plantations raised a crop of cotton, a portion of which, in December, 1862, or in January, 1863, was hauled to Wilson's Burn, a place then used for the storage of cotton belonging to, or intended to be sold to, the Confederate government, and also for the storage of the cotton of individuals. The cotton was marked by the agents, "C. S. A.," in order to save it from destruction by Confederate soldiers, but it was not so marked by direction of Morehead.

Whilst the cotton was there three hundred and eighty bales of it were, in March, 1863, taken by Captain Osband of the Fourth Illinois Cavalry, acting under orders of General Grant, to Worthington's Landing on the Mississippi River, where it was intermingled with other cotton from adjacent plantations, and shipped to Memphis, Tennessee, and there turned over to Captain Fort, Assistant Quartermaster General of the United States Army. The whole amount of cotton received by him was twenty-one hundred and thirty bales, which, after being rebaled and thereby reduced to twenty-one hundred and eleven bales, was sold by him, and the proceeds accounted for to the United States, amounting to $422,125.70. The cotton, including the three hundred and eighty bales mentioned above, which came from the plantations of Morehead, amounted to

four hundred and fifty-five bales, and their proportional part of the proceeds was $91,000. There is a discrepancy between this amount and that which is subsequently claimed in the amended petition. There is also a discrepancy between the number of bales stated in the findings to have been received by the Quartermaster General and the number mentioned in the act of Congress of June 4, 1888. But these discrepancies are slight, and do not affect the questions considered.

The exact state of the indebtedness from Morehead to Briggs, at the time of the execution of the bill of sale, does not appear. Briggs had paid eight or ten thousand dollars for Morehead, and the latter had collected Briggs's portion of a fee amounting to five thousand dollars, and was in the habit of borrowing money from him during the continuance of their law partnership, until the commencement of the war. It does not appear that any definite settlement was had between them. C. M. Briggs having died, his brother, James A. Briggs, was on the 15th of July, 1875, appointed executor of his estate by the county court of Jefferson County, in Kentucky, of which county the deceased was at the time of his death a citizen and resident. He accepted the trust and qualified by taking the necessary oath and executing the required bond.

By a special act of Congress, passed on the 4th of June, 1888, (25 Stat. 1075, c. 348,) the Court of Claims was given, subject to certain conditions hereafter named, like jurisdiction to hear and determine the claim of the legal representatives of C. M. Briggs for the proceeds of four hundred and fifty-five bales of cotton, stated in the act to be then in the Treasury of the United States, and alleged to have been owned in whole or in part by the deceased, as was given to that court by the acts of March 12, 1863, and July 2, 1864, upon petition to be filed in that court within two years from the passage of the act, notwithstanding any statute of limitations to the contrary. One of the conditions named was that on a preliminary inquiry the court should find that Briggs was in fact loyal to the United States government, and that the assignment to him from Morehead was *bona fide;* the sale from Morehead being thus designated in the act. A further con-

dition was, that if the court should find that the alleged
assignment from Morehead to Briggs, under which Briggs
claimed the cotton, was intended only as security for indebt-
edness and against contingent liabilities assumed for More-
head, then judgment should be rendered for such portion of
the proceeds of the said cotton as would satisfy the debts and
claims. It was also provided that the judgment should not
be paid out of the general fund in the Treasury arising from
the sale of captured and abandoned property, but should be
paid out of the special fund charged to and accounted for by
Captain Fort, Assistant Quartermaster, arising from the sale
of the twenty-two hundred and nine bales of cotton received
by him, with which claimant's cotton was intermingled; the
claimant to receive only the proportionate part which his
cotton might bear to the net proceeds accounted for by
Captain Fort.

The executor accordingly filed his petition, in which, as
amended, he alleges that, of the net proceeds of the cotton
accounted for by Captain Fort, there remains in the Treasury,
after deducting the payments properly chargeable to the same,
and which have been paid out to various claimants on judg-
ments of the Court of Claims, the sum of $138,523.92, being
the net proceeds of six hundred and twenty-one bales of cot-
ton, for which no claim has ever been made on which judg-
ment has been rendered, or payment obtained from the
Treasury. And the petitioner alleges that of this sum he is
entitled to recover his pro rata share, corresponding to his
four hundred and fifty-five bales, amounting in the aggregate
to $101,794.57, for which he prays judgment.

A preliminary inquiry was had by the Court of Claims as
to the loyalty of the testator, C. M. Briggs, during the war,
and as to the *bona fide* character of the assignment to him by
Morehead; and it was found that the testator was in fact
loyal to the United States government, and that the assign-
ment to him by Morehead of April 18, 1862, was *bona fide*.

The case being thus freed from these preliminary inquiries,
the only questions remaining for consideration were, first, the
effect of that assignment in passing title to the cotton raised

on the plantations and seized by the forces of the United States and sold; second, the right of the owner or assignee to the proceeds received, he being loyal to the government of the United States during the war; and, third, the amount of the claims of the deceased against Morehead payable out of such proceeds.

The court held that cotton raised in the Confederate States during the war was hostile property which the United States had the right to and did apply to their own uses while it continued; that the fact that the owner or assignee of the cotton was a loyal man during the war did not affect the right of the United States to thus apply it, or the proceeds of its sale, to their own use; and that therefore no liability rested upon the government of the United States to account for the property, or its proceeds when sold, to the owner or assignee. The petition was accordingly dismissed, (25 C. Cl. 126,) and from the decree of dismissal the case is brought to this court on appeal.

*Mr. Philip B. Thompson, Jr.,* and *Mr. W. J. Moberley* for appellant.

*Mr. Assistant Attorney General Maury* for appellee.

MR. JUSTICE FIELD, having stated the case, delivered the opinion of the court.

Though at the time the sale, or assignment, as it is termed in the act of Congress, was made of the cotton on the plantations in Mississippi, or to be raised thereon during the year 1862, the late civil war was flagrant, there was no rule of law arising from the existence of hostilities between the different sections of the country which in any respect impaired the validity of the transaction. Both parties were then residents and citizens of Kentucky, and no agreement was made for the transportation and delivery of the cotton across the lines separating the insurrectionary States from those which maintained their loyalty and adhered to the Union. Morehead, the owner, was in the spring of 1861, at the commencement

of the war, on the plantations in Mississippi; and in May or June following, when a prolonged struggle seemed inevitable, he placed one of them in charge of his son and the other in charge of an overseer, and returned to Kentucky. It does not appear that ever afterwards during the continuance of the war he had any communication with either. They superintended the plantations, and in 1862 raised a crop of cotton thereon, the greater part of which, if not the whole, was afterwards seized by the forces of the United States, placed in the custody of an assistant quartermaster of the army, sold by him, and the proceeds paid over or accounted for to the Treasury of the United States.

In *Conrad* v. *Waples*, 96 U. S. 279, 286, we said of a sale of real property within the Confederacy between two persons residents there during the war:

"The character of the parties as rebels or enemies did not deprive them of the right to contract with and to sell to each other. As between themselves, all the ordinary business between people of the same community in buying, selling and exchanging property, movable and immovable, could be lawfully carried on, except in cases where it was expressly forbidden by the United States, or where it would have been inconsistent with or have tended to weaken their authority. It was commercial intercourse and correspondence between citizens of one belligerent and those of the other, the engaging in traffic between them, which were forbidden by the laws of war and by the President's proclamation of non-intercourse. So long as the war existed, all intercourse between them inconsistent with actual hostilities was unlawful. But commercial intercourse and correspondence of the citizens of the enemy's country among themselves were neither forbidden nor interfered with, so long as they did not impair or tend to impair the supremacy of the national authority or the rights of loyal citizens. No people could long exist without exchanging commodities, and, of course, without buying, selling and contracting. And no belligerent has ever been so imperious and arbitrary as to attempt to forbid the transaction of ordinary business by its enemies among themselves.

No principle of public law and no consideration of public policy could be subserved by any edict to that effect; and its enforcement, if made, would be impossible."

The property in this case was real estate, but we do not perceive how that fact would alter the validity of a transaction, if it could be affected by the character of the parties. If residents of the enemy's country may contract for property situated within it, there would seem to be no objection to similar transactions by persons residing outside of the Confederate lines and adhering to the national government, so long as no intercourse or connection is kept up with the inhabitants of the enemy's country. As stated in the case from which we have cited, it was commercial intercourse and correspondence between citizens of one belligerent and the other, and the engagement in traffic between them, leading to the transmission of money or property from one belligerent country to the other, which was forbidden.

There was, therefore, nothing in the sale of the cotton on the plantations, or of cotton to be raised thereon, there being no agreement respecting its movement across the border of the contending sections, which brought the transaction within the prohibitions of any rule of international law or the proclamations of the President of the United States in 1861. (12 Stat. 257, 1262; 13 Stat. 731.)

Those who may desire to examine the decisions of the courts as to the nature and extent of the prohibitions upon transactions between subjects of countries at war, or between subjects of the same country respecting property situated in the enemy's country, will find in the opinion of the Supreme Judicial Court of Massachusetts, in *Kershaw* v. *Kelsey*, 100 Mass. 561, the subject ably and exhaustively considered, with an analysis of the most important decisions of the English and American courts.

The sale not being open to objection as relating to property within the hostile territory, the question arises whether it was sufficient to pass the existing cotton on the plantations and crops to be subsequently raised thereon; and on that question we have no doubt. The crop which was afterward seized by

the forces of the United States was not then in existence, but from the fact that it was raised during the year we conclude it was already planted; though if otherwise, the fact would not be material. The sale would take effect the moment the crop appeared. In *Butt* v. *Ellett*, 19 Wall. 544, the question was as to the effect of an instrument purporting to be a mortgage of a crop, the seed of which had not been sown. A plantation in Mississippi was leased for one year for $3500, for which the lessee gave his note, and to secure it embodied in the lease a mortgage of all the crops raised on the plantations during a certain designated year. It was held that the mortgage clause could not operate as a mortgage, because the crops to which it related were not in existence, but that when they grew the lien attached and bound them effectually from that time.

In *Andrew* v. *Newcomb*, 32 N. Y. 417, 421, the Court of Appeals of New York held that in the case of crops to be sown, the title vests potentially from the time of the bargain, and actually as soon as the subject arises. The court cited several cases, going back as far as the time of Chief Justice Hobart, to sustain this doctrine, observing that they sufficiently showed that crops to be raised were an exception to the general rule that title to property not in existence cannot be affected so as to vest the title when it comes into being.

The delivery of the crops was not essential to pass the title as between Morehead and Briggs. The law on the subject of the sale of personal property does not require impossibilities, as would be a delivery in a case of that kind. The cotton was not at the time grown, and even if the sale be deemed incomplete until the actual appearance of the crop, it could not then be removed from the soil for delivery; besides, it was within the limits of a recognized enemy's country, and any attempt to transport it to the Union side for delivery would have been unlawful.

By the common law a sale of personal property is complete and the title passes as between vendor and vendee when the terms of transfer are agreed upon, without actual delivery. In *Simmons* v. *Swift*, 5 B. & C. 857, 862, it was so held by

the Court of King's Bench, Justice Bailey using this language : " Generally speaking, where a bargain is made for the purchase of goods, and nothing is said about payment or delivery, the property passes immediately, so as to cast upon the purchaser all future risk, if nothing further remains to be done to the goods, although he cannot take them away without paying the price." ·

In *Gilmour* v. *Supple*, 11 Moore P. C. 551, 566, the Privy Council, in giving its judgment, said: " By the law of England, by a contract for the sale of specific ascertained goods, the property immediately vests in the buyer, and a right to the price in the seller, unless it can be shown that such was not the intention of the parties."

In Kentucky, where the sale in this case was made, the common law rule prevails. In *Willis* v. *Willis*, 6 Dana, 48, the Court of Appeals of that State said : " So soon as a bargain of sale of personal goods is struck the contract becomes absolute without actual payment or delivery, and the property and risk of accident to the goods vest in the buyer."

Nor was the sale void within the statute of frauds. There was no creditor or purchaser who could question the transfer of title to the vendee. The government stood in no such relation and could raise no such objection. It had no preëxisting demand or equity against the property. All the rights· of the government resulted from capture.

And this brings us to the consideration of the most important question in the case : Whether the United States acquired title to the property by its capture, and can, therefore, disregard the claim of ownership by the testator or petitioner, and treat the cotton as property confiscated to their use. The Court of Claims held that the United States rightfully appropriated the property and its proceeds, and were not under any obligation to account for them to the owner or his representative.

It proceeded upon the doctrine that the Confederate States and the States which adhered to the Union were engaged in a civil war, having such proportions as to be attended with the incidents of an international war, and that therefore the United

States could treat all property within the Confederate lines as enemy's property, and in the exercise of their belligerent rights seize and appropriate to their own use any of it which could be of service to them in the prosecution of the war; and that the property which was most beneficial to the Confederacy in furnishing funds was cotton, and it was for that reason particularly sought by the national forces for capture. The Court of   ims recognized the doctrine, also, that the right of captu extended to the products of the soil, whether owned by citizens of the Confederacy or strangers to both belligerents, and that the capture of movable property within the Confederacy transferred the title when reduced to firm possession; and it therefore held that when the cotton for the proceeds of which this action is brought was captured by the national forces and sold and the proceeds paid into the treasury of the United States, the title to the property and proceeds passed absolutely to the general government.

This decision of the Court of Claims would have been correct, and been sustained, had the government of the United States confined its action simply to the enforcement of its rightful powers as a belligerent, and had not surrendered its rights as a belligerent to appropriate property of a particular kind taken in the enemy's country, belonging to a loyal citizen.

In *Brown* v. *United States*, 8 Cranch, 110, 122, 123, the court said that it was conceded that war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found, and observed that the mitigations of this rigid rule, which the humane and wise policy of modern times had introduced into practice, might more or less affect the exercise of this right, but could not impair the right itself.

Substantially the same thing was said in *Young* v. *United States*, 97 U. S. 39, 60: " All property," was the language of the court in that case, " within enemy territory is in law enemy property, just as all persons in the same territory are enemies. A neutral, owning property within the enemy's lines, holds it as enemy property, subject to the laws of war; and, if it is hostile property, subject to capture."

But in another case, that of *Mrs. Alexander's Cotton*, 2 Wall. 404, 419, this court said that "this rule, as to property on land, has received very important qualifications from usage, from the reasonings of enlightened publicists, and from judicial decisions. It may now be regarded as substantially restricted 'to special cases dictated by the necessary operation of the war,' and as excluding, in general, 'the seizure of the private property of pacific persons for the sake of gain.'"

The circumstances in which the late war originated, and the fact that within the Confederate lines there were multitudes of people who were sincerely attached to the government of the Union and desired its success, gave ample reason to the Federal government for a modification of the harsh rules of war in regard to the capture of property on land, so as not to bring within the same calamity friend and foe. It was a desire to ameliorate as much as possible the exercise of the necessary belligerent right of capture of property within the rebel lines, in its application to the property of persons thus friendly to the Union, so far as cotton was concerned, which led to the passage of the Captured and Abandoned Property Act of March, 1863, and the subsequent amendments thereto.

Cotton was considered the great means of procuring supplies for the Confederate government. It is well known to have been its chief reliance for the purchase of arms and other munitions of war abroad; indeed, without this resource, the Confederacy would have been deprived of its greatest means of obtaining the necessary supplies to continue the struggle. As said by this court in the case of *Mrs. Alexander's Cotton*, 2 Wall. 420, cited above, no principle of equity or just policy required when the national occupation was itself precarious, that it should be spared from capture and allowed to remain, in case of the withdrawal of the Union troops, an element of strength to the rebellion.

The acte Congress of March 12, 1863, providing for the collection of abandoned and captured property in the insurrectionary territory, (12 Stat. 820, c. 120,) declared that all such property might be appropriated to the public use or sold. But it also said, in substance, that the property of friend and foe

cannot at the time be separated; and all the property of that kind found within the Confederate lines will be taken, sold, and when sold its proceeds will be deposited in the Treasury; but if afterwards within two years after the suppression of the rebellion the owner can establish to the satisfaction of the Court of Claims his title to the property thus taken, and his loyalty to the Union cause, then the portion of the proceeds belonging to him shall be restored, after deducting the expenses attendant upon its capture, removal and custody. *United States* v. *Anderson*, 9 Wall. 56, 67.

Under this act immense amounts of property belonging to citizens of the United States, who sincerely mourned the origin of the Confederacy, and longed for the re-establishment of the national government, and who kept faith in their hearts through the whole of the long struggle, were accounted for and the proceeds restored to the rightful owners; and certainly it must be regarded as a most beneficent act on the part of the general government. The records of the Court of Claims show a multitude of cases where this law has been administered, and many loyal people have had the proceeds of their property returned to them, which had been captured because of the fact that it was situated within hostile territory.

In the present case, the petitioner was allowed the same right to present his claim for the proceeds of the property belonging to his testator which would have been allowed if the testator himself had presented his claim within two years after the capture. The question was as to the loyalty of the testator of the claimant; and also as to his ownership of the cotton. His loyalty was found by the court, and also the *bona fides* of the sale of the property. After these facts had been established the only question that could have been properly considered was the amount of the proceeds which the petitioner should receive. That was not considered by the Court of Claims.

In passing the act, Congress considered that a question might arise whether the transaction between Morehead and Briggs constituted a sale, or an assignment by way of mortgage, although it purports to be a sale and transfer. The act pro-

vides that if the transaction was intended only as security for indebtedness and against contingent liabilities, only such portion of the proceeds should be awarded to the petitioner as would satisfy the debts and claims of the testator, to secure which the assignment, as it is termed in the act, was made.

The case, therefore, will be

*Reversed, and sent back to the Court of Claims, with instructions to pass upon the question whether the transaction was an absolute sale or merely a mortgage or pledge; and according to the view adopted the amount of the proceeds due and payable to the petitioner should be ascertained, and it is so ordered.*