Howey, Judge,
delivered the opinion of the court:
This is one of a large class of cases for the recovery of the proceeds of a certain lot of cotton which had been sold by Treasury agents and the proceeds placed in the Treasury of the United States. This cause and a large number of companion cases of a similar character arise under that section of the act of March 3, 1911, 86 Stats., 1087-1169, which appears in the Judicial Code as section 162 and which became effective January 1, 1912. The act is as follows:
“ Seo. 162. The Court of Claims shall have jurisdiction to hear and determine the claims of those whose property was taken subsequent to June the first, eighteen hundred and sixty-five, under the provisions of the act of Congress approved March twelfth, eighteen hundred and sixty-three, entitled ‘An act to provide for the collection of abandoned property and for the prevention of frauds in insurrectionary districts within the United States’ and acts amendatory thereof where the property so taken was sold and the net proceeds thereof were placed in the Treasury of the United States; and the Secretary of the Treasury shall return said *302 net proceeds to the owners thereof on the judgment of said court, and full" jurisdiction is given to said court to adjudge said claims, any statutes of limitations to the contrary notwithstanding.”
The third section of the original act relating to the collection of abandoned or captured property contained the requirement that on proof of ownership of such property and of his right to the proceeds thereof the person claiming .to be such owner should be entitled to the proceeds of his cotton; but on further proof to the satisfaction of the court that the person so claiming “had never given any aid or comfort to the present rebellion.” The original act containing this provision was approved March 12, 1863, 12 Stats., 820.
The original and first amended petition not meeting these requirements defendants entered a motion to dismiss. This hind of a motion appears in all kindred cases where there appears to be a want of strict compliance with the act of March 12,1863, above mentioned.
After the motion to dismiss had been made in the present cause a second amended petition was filed in which it appears* to be alleged without qualification that the decedent at all times bore true allegiance to the Government of the United States. The allegation of the loyalty of the claimant administrator is left in the form in which it appeared in the first amended petition. Then follows the statement in the second amendment substantially that to the claimant * * * for any such cause of insurgency committed during the late Civil War, including service in the Confederate Army, a full pardon had been granted by the President of the United States.
Section 159 of the Judicial Code provides:
“ Sec. 159. The claimant shall in all cases fully set forth in the petition the claim, the action thereon in Congress or by any of the departments, if such action has been had; Avhat persons or owners thereof or interested therein; when and upon what consideration such persons became so interested ; that no assignment or transfer of said claim or of any part thereof or interest therein has been made, except as stated in the petition; that such claimant is justly entitled to the amount therein claimed from the United States after allowing all just credits and offsets; that the claimant and, *303 where the claim has been assigned, the original and every prior owner thereof, if a citizen, has at all times borne true allegiance to the Government of the United States, and, whether a citizen or not, has not in any -way voluntarily aided, abetted, or given encouragement'io rebellion against the said Government, and that he believes the facts as stated in the said petition to be true. The said petition shall be verified by the affidavit of the claimant, his agent, or attorney.”
Section 160 of the Judicial Code provides:
“ Sec. 160. The said allegations as to true allegiance and voluntary aiding, abetting, or giving encouragement to rebellion against the Government may be traversed by the Government, and if on the trial such issues shall be decided against the claimant, his petition shall be dismissed.”
Defendants contend that if the abandoned and captured property act is revived by section 162 of the Civil Code it is revived in all its parts and that such act remains as of August 20, 1868, when the act ceased to operate by its own limitation; and further, that the only alteration made in said act is to permit the recovery of the proceeds of cotton taken and sold after June 1,1866, regardless of the statute of limitations. The argument is that the averment of the loyalty provisions without qualification, as they appear in the abandoned or captured property act, is necessary under sections 159 and 160 of the code because the amnesty extended to persons participating against the Government can not control the power of Congress as to the grant or refused to grant jurisdiction to this court.
The act under which all these cases have been brought does not relate to property taken under the proceedings confiscating property. The confiscation act of July 17, 1862, and the joint resolution of that date, was legislation for the confiscation of enemies’ property. Forfeitures were provided, effective during the life of an offender, by this legislation. But even as to the confiscations provided for by that and other acts, the Supreme Court declared that the joint resolution had the same meaning as the constitutional ordinance, and that both sought to limit the extent of forfeiture proceedings. Wallach v. Van Riswick, 92 U. S., 202.
The confiscation acts, it has been held, were penal; the abandoned and captured property act remedial; the one *304 claimed a right, the other conceded a privilege. For this reason these acts were construed not to be in pari materia, and could not be according to Anderson’s case, 9 Wall., 67, where it was held that the confiscation laws were predicated strictly upon the right to seize and condemn property as a punishment. These two acts of Congress, the confiscation act of July 17, 1862, with the concurrent joint resolution, and the abandoned or captured property act, serve to emphasize the manifold duties and powers conferred upon this court and the necessity to apply different rules of interpretation and construction on the separate acts of legislation because the powers of this court are made up of different and distinct jurisdictions and the acts conferring these various jurisdictions have not been often contemporaneous. Congress have conferred jurisdiction by many statutes of a special nature quite foreign from the proceedings authorized under the general jurisdiction of the court, and for this reason general provisions can not be applied indiscriminately.
Sections 159,160, and 161 of the code are substantially the same as sections 1072,1073, and 1074 of the Revised Statutes. All these statutes are general in their nature and within that class known in the law as personal statutes. True, they treat of property, but only incidentally. Personal statutes as denominated in the law are those which include the right of instituting suits with the correlative right to plead in person. The original statutes which are now brought forward to the Judicial Code were only personal disability statutes. As they appear in the existing law they disclose enough on their face to limit the jurisdiction of the court as against those only within their strict meaning. But as the Congress have brought forward in the work of codification the former statutes, the lawmakers must have intended that these sections should be executed as construed by the Supreme Court; that is to say, with the limitations imposed by the construction of that tribunal." Hence, proceedings under these statutes go on just as they have gone on since the decisions of the Supreme Court.
Section 159 is a reenactment, without material change, of the original statute. Section 160 is taken verbatim from the old statute. Section 161 is the same as the former statute *305 except for the substitution of the words “ Civil War ” for the word “rebellion;” the insertion of the words “ Confederate States ” and the word “ service,” followed by the elimination of the provision making certain facts prima facie evidence of disloyalty.
The reenactment in the same words of a statute which has received an authoritative construction in practice gives rise to the presumption that such construction is satisfactory to the legislature unless plainly erroneous. Copper Queen v. Territorial Board,, 206 U. S., 474.
The Court of Claims long ago declared that since the decision of the Supreme Court in the Armstrong and Pargoud cases “this court has not required claimants to aver and prove their loyalty, although the language of the Revised Statutes is that they shall set out in their petition that they have at all times borne true faith and allegiance to the United States, and have not given aid and comfort to rebellion in general, while the loyalty to be proved under the abandoned and captured property act to which those decisions referred, and the disloyalty pardoned by the proclamation of general amnesty, related to the late rebellion only.” White v. United States, 19 C. Cls. R., 440. That decision had no reference to the proof of loyalty required in certain cases under the provisions of the Bowman Act, 22 Stat., 485, because of the necessity to allege and prove loyalty in fact under and by virtue of the jurisdictional requirement in Bowman Act proceedings. The history of the act of March 3,1883, commonly known as the Bowman Act, shows that in that early period Congress was attempting to provide for the lawmaking bodies information of an advisory character only and strictly for people who had been loyal and as an ancillary aid for the information and action of the great departments of the Government.
The last-mentioned decision was followed by another cause wherein it was declared that since the proclamation of amnesty promulgated December 25,1868,15 Stats., 711, the loyalty of citizen claimants under sections 1072 and 1073 ceased to be a subject of inquiry in this court. Officers of S. Carolina Troops v. United States, 20 C. Cls. R., 21.
*306 These decisions were rendered nearly 30 years ago. They have been acted upon ever since, not only in general jurisdiction cases but in other cases under special jurisdictional acts and in very many causes transmitted to the court for investigation either by Congress or from the departments. Loyalty vel non has been so much eliminated that no claimant within its influence has been barred within the period of limitation from prosecuting to judgment his cause in this court.
A brief reference to certain decisions seems proper to sustain the practice of the Court of Claims in regard to the matter of loyalty.
After some of the cases arising under the confiscation acts were decided, there came on to be heard by the appellate tribunal a number of cases under the abandoned or captured property act. Just here it is pertinent to note that the principle established in Wattach v. Van Riswick, supra, was reviewed and substantially reversed by a later decision of the supreme tribunal. The question presented in that case was whether the former owner of a confiscated estate could transfer by deed the suspended fee to the property. The court thought that Congress had passed the confiscation act of July 17,1862, for the purpose of completely dispossessing the owner of all benefits in the property seized and had not intended to permit him to retain any right of conveyance: that the forfeiture while it lasted was so complete as to be a devolution upon the United States of the owner’s entire right and that the provision regarding the duration of the forfeiture was introduced for the advantage of the children and heirs alone. But in Jenkins v. Collard, 145 U. S., 546, it appeared that the Jenkins property had been confiscated and purchased by Collard. Subsequently Jenkins transferred all his interest and estate in the property for a considerable sum with a covenant of general warranty, binding himself and his heirs. The conveyance was made directly to Collard, who had purchased under confiscation proceedings. The court was put in the position of having to' settle whether the title conveyed was valid against the heirs of Jenkins. In disposing of the question of the reversionary right the court took the ground in the later decision that the former ruling *307 imposing upon tbe offender the disability to transfer the reversionary right was based, not upon any express provision of law, but upon what the court thought the policy of confiscation involved. In applying the law to the question raised as to the character of the conveyance the Supreme Court decided that the offender by his covenant of warranty could convey a permanent future title good against the claims of the heirs of the grantor. But in this connection it is pertinent further to note that in the Jenkins case the Supreme Court took the occasion to declare that the general pardon and amnesty made by the public proclamation of the President at the close of the war had the force of 'public law. So there is no advantage to be gained by the argument made at the bar in the case we are now considering that the action of Congress was necessary to strengthen the validity and the effect of the presidential proclamations.
From the beginning there was a clear and necessary distinction between the acts providing for confiscations and acts providing for seizures because the objects, as we have shown, were different. In those later acts (which provided for seizures only) there was practically a bid to the owners of the property to yield because the passage of the acts authorizing seizures (particularly of cotten) were either contemporaneous with offers of amnesty or were quickly followed by special proclamations of condonation which meant a return of the proceeds of the goods taken if owners would take the oath.
The case we have just cited serves to show that even by means of proceedings in rem amnesty relieved the situation — ■ so anxious was the United States to restore property if the terms were accepted by those in arms against the Government.
After some of the confiscation cases had been decided there came on to be heard by the Supreme Court on appeal from the Circuit Court for the Eastern District of Louisiana the case of Armstrong's Foundry, 6 Wall., 766. That was a libel of information charging that certain property in New Orleans, known as Armstrong’s Foundry, had been seized and forfeited to the United States by reason of the use of the foundry with the owner’s consent in aid of the rebellion. *308 This seizure was under the first confiscation act of August 6, 1861, 12 Stat., 319. Armstrong interposed his claim as the owner and plead the special amnesty of the President and his acceptance of the terms. This plea was rejected and the property condemned. While the appeal was pending Armstrong was permitted to plead as new matter the fact of full amnesty granted him, by name, with certain conditions and showing with his plea full compliance with the conditions. The effect of the special amnesty granted was considered to relieve the owner of the property of so much of the penalty as accrued to the United States.
This case was followed by that of Padelford v. United States, 9 Wall., 533. There the claimant had taken the oath of amnesty in January, 1865, under the terms of the proclamation of December 8, 1863. The Supreme Court declared that the pardon was sufficient to wipe out any imputation of disloyalty prior to the taking of the oath and that if claimant’s cotton had been seized before the oath was taken the faith of the Government was pledged to its restoration when it also appeared that the oath had been taken in good faith. This decision made the proof of pardon a complete substitute for proof that the claimant gave aid and comfort to the rebellion.
Next came the case of Klein v. United States, 13 Wall., 128.
The proclamation of December 8, 1863, offered a full pardon, with restoration of all rights of property except slaves and that in which the rights of third persons had intervened ; the next one was that of March 24, 1864, which was limited to a class; the third proclamation, of May 29, 1864, offered amnesty with restoration of property rights except slaves and that as to which legal proceedings had been brought by the United States and excepting certain classes of individuals; the next proclamation, of September 7, 1867, offered amnesty with restoration of property as before and on the same oath prescribed by former edicts to all except three classes; the next was on July 4, 1868, which granted amnesty with some exceptions, and finally, on December 25. 1868, a proclamation came setting forth a full pardon and amnesty to all persons for adhering to their enemies during the Civil War, with restoration of all rights, privileges, and *309 immunities. The court held that under the statutes referred to except that mentioned in the first section of the act of March 12,1863, no titles were divested in the insurgent States unless in pursuance of a judgment in legal proceedings; that it was reasonable to infer that it was the purpose of Congress that the proceeds of the property for which the special provision of the act was made should come into the Treasury without change of ownership. It was added that this was certainly the intention in respect to the property of loyal men and that the same intention probably prevailed in regard to the property of owners who though then hostile might subsequently become loyal from the circumstance that no provision had anywhere been made for confiscation. That case was notable because the court held that the Government had constituted itself the trustee for those who were by the act declared entitled to the proceeds of captured and abandoned property, and for those whom it should thereafter recognize as entitled.
In his dissent in Klein’s case Mr. Justice Miller stated that he understood the opinion of the court to mean that the Government became the trustee of all the former owners, whether loyal or disloyal, and continued to hold the proceeds for the disloyal until pardoned by the President or until Congress ordered the proceeds to be returned. The judges dissenting from certain of the conclusions in Klein’s case appear not to have differed from essentially the same results in the cases of Armstrong, Pargond, and Carlisle which immediately followed. The opinions appear to be unanimous in the three cases mentioned.
In Mrs. Armstrong's case, 13 Wall., 154, the court found that she was not loyal. On appeal the Supreme Court held that the proclamation of amnesty dated December 25, 1868, was sufficient to enable that claimant to maintain her suit. The effect of this was to give Mrs. Armstrong the benefit of the amnesty granted after the efflux of the period in which the suit could be brought under the abandoned and captured property act. As a matter of fact, Mrs. Armstrong’s suit was begun in time and she was given the benefit of a pardon which at the time of the institution of the suit had not been tendered.
*310 In Pargoud v. United States, 13 Wall., 152, the petitioner averred no loyalty at all, but admitted insurgency, though claiming that he had been legally pardoned. This court dismissed the petition. On the appeal motion was made to dismiss under the proviso known as the Drake amendment to the act of July 12,1870, set forth in Klein’s case. The court held that the pardon of 1866 had the same legal effect as the general proclamation of December 25,1868, mentioned in the case of Mrs. Armstrong.
In Carlisle v. United States, 16 Wall., 147, this court found that the claimants were the owners of certain cotton seized in 1864, sold, and the proceeds paid into the Treasury. But the claimant was a subject of Great Britain, who had given aid to the Confederate States. The Supreme Court said that it must be regarded as settled that the pardon, whether granted by special letters or by general proclamation, relieved claimants from the consequences of participation in rebellion and from the necessity of establishing their right in order to prosecute their claims. The appellate court stated that it could not suppose that Congress intended by the general language of the act to encroach upon any of the prerogatives of the President, and that all general terms and statutes should be limited in their application, so as not to lead to injustice, oppression, or unconstitutional operation, if possible.
In Haycraft's case, 22 Wall., 81, the suit was instituted some years after the expiration of the period allowed for the bringing of suits for the proceeds of cotton. This was a suit brought to recover, not the proceeds of cotton, but the value of the staple at the time and place it was captured. The petition renounced any right of action under the captured and abandoned property act because claimant said in terms that he was a rebel and admitted that he had no right to sue for the proceeds of his cotton until he was amnestied by the general proclamation of December 25, 1868, when the time for bringing suits for the proceeds had expired. This cause dealt with the meaning and effect of the statute itself which gave the right and offered a remedy. Because the remedy had expired it was determined that there was no jurisdiction to enforce the alleged right set forth in the petition for the value of the property.
*311 In Young v. United, States, 97 U. S., 39, it appeared that petitioner was a British subject engaged in fitting out blockade runners used to carry in munitions of war and carry out cotton for the Confederate States. The court held that the cotton found within Confederate territory was a legitimate subject of capture and title thereto passed to the Government as soon as the property was reduced to “ firm possession.” The acts of disloyalty prevented this alien from recovering for the reason that, being a nonresident, he was not within the terms of the amnesty. But the court approved the doctrine of the Padelford and other cases, and on the subject of title added that the capture of movable property on land transferred the same to the Government of the captor as soon as the capture became complete.
Tn Knote v. United States, 95 U. S., 149, the action seems to have been based upon the confiscation acts. The court held that there was no legal claim by anyone because there was no implied contract in the case. That case has nothing to do with this issue.
In Erwin v. United States, 97 U. S., 392, the court held that where cotton was captured by the military forces of the United States and sold and the proceeds paid into the Treasury the claim of the owner against the Government constituted property which passed to an assignee in bankruptcy, though by reason of the bar arising from lapse of time the right could not be judicially enforced. That case was decided under a special act not intended to enlarge or affect his title to the claim, or to change his position in court from what it would have been had the suit been instituted within the two years prescribed by the special act. No point was raised against the status of Erwin arising out of his former connection with the Confederate Army, because the court said the disability thus created had been removed by the President’s proclamation. The point in dispute related to the validity of the title on the contention that the claim against the Government for the proceeds of the cotton never passed to the assignee in bankruptcy and, if it did pass, the claimant afterwards became the owner of it by purchase of the assets at the sale mentioned. The court held that when the appellant filed his petition in bankruptcy his claim *312 against the Government was property, though of uncertain value. That “ it was a claim for the proceeds of goods which once belonged to him, and of the possession of which he had been deprived by the action of the Government. Whether this was done rightfully or wrongfully does not affect the character of the claim as property though it might affect its validity and value.”
It is historical that there were changing and peculiar conditions affecting property in the cotton-growing sections during the progress of the war. At the outset the Confederate Government purchased cotton for sale abroad as the same could be exported, using the proceeds in exchange for supplies and munitions of war. Later, that government ordered cotton to be destroyed when in danger of capture. Meantime, the Confederate authorities were impressing cotton far removed from capture when owners would not sell, giving in exchange the paper obligations of the experimental government. Some of the States issued cotton obligations, and the domestic transactions in the sale and purchase never ceased. The United States, on the other hand, in the beginning did not invade the hostile section with any intent to deprive the people there of their means of subsistence or to appropriate private property of any kind, except as stated under the confiscation acts. Deferring to the rigid rule that by the laws of war the right of capture existed, the Supreme Court, in Mrs. Alexander’s Cotton, 2 Wall., 419, said that, “This rule, as to property on land, has received very important qualifications from usage, from the reasonings of enlightened publicists, and from judicial decisions. It may now be regarded as substantially restricted to special cases dictated by the necessary operations of the war, and as excluding, in general, the seizure of the private property of pacific persons for the sake of gain.”
In almost the last decision relating to the seizure of cotton, Briggs v. United States, 143 U. S., 357, the Supreme Court cited with approval the language used in the case of Mrs. Alexander's Cotton, to the effect that “ No principle of equity or just policy required, when the national occupation was itself precarious, that it should be spared from capture *313 and allowed to remain, in case of the withdrawal of the Union troops, an element of strength to the rebellion.”
The acts necessary to good order among citizens, including acts regulating the conveyance and transfer of property, and other similar acts valid as if emanating from a lawful government, have been regarded in general as valid when proceeding from an actual, though unlawful government, though the court said acts in general in furtherance or in support of rebellion against the United States are regarded as invalid. Home Ins. Co. v. United States, 22 Wall., 99; reprinted 10 C. Cls. R., 154. This, of course, means voluntary acts.
The case of Austin v. United States, 155 U. S., 417, turned upon the construction of the proviso in a special jurisdictional act. The appellate court construed the special act to mean that there must be proof of loyalty in fact on the part of Austin as distinguished from loyalty in law. But no discredit was thrown upon the effect of the amnesty proclamation. [Recovery was denied on the ground that a proclamation of amnesty could not control the power of Congress in giving or withholding jurisdiction.
Taking the decisions all together, we deduce the following:
(1) The proclamation of December 25, 1868, relieved all persons within its influence from the pains and penalties of disloyalty and from any offense whatsoever in aid of the Confederate States. It blotted out whatsoever offense there was against the Government as effectually in contemplation of law as if the persons to whom amnesty was given had never engaged in hostile service or aided or sympathized with the Confederate States.
(2) That the abandoned and captured property act granted jurisdiction to the Court of Claims and prescribed a right and a remedy. The remedy expired at the end of two years from the official declaration designating the time of the conclusion of the war, and when that period expired the jurisdiction ended alike to the loyal and the disloyal.
(3) During the time the Court of Claims had the right to exercise jurisdiction persons residing in the Confederate States who were loyal and persons who had not been loyal *314 but were duly pardoned could sue alike for and recover the proceeds of their cotton in the Treasury seized under the act of March 12, 1868, by proof of ownership. Where suit was brought within the period limited persons who had been disloyal, but who were subsequently pardoned by the general amnesty of December 25, 1868, after the close of said period could use their pardon in aid of their suits if brought within the time.
(4) That Congress had plenary power at any time to authorize the payment of claims described by section 162 of the Judicial Code. It was, and is, a matter of congressional policy to give, or not confer, jurisdiction at discretion, and, as said in Erwin’s case, the character of a demand for the proceeds of cotton in the Treasury is a claim for property irrespective of whether the taking was rightful or wrongful.
(5) The funds in the Treasury derived from the proceeds of the sale of all abandoned or captured property remain subject to congressional legislation, just as all other funds there are subject to congressional direction.
(6) That the amnesty in itself established proof of loyalty regardless of former status.
Have the Congress sufficiently exercised this plenary power by section 162 of the Judicial Code ?
The function of the court is to seek the intention of the lawmakers and to apply the inferences arising from the subject matter, because every reasonable inference must control. In construing the section under consideration, and to arrive at the intent, the court may recur to the history of the times to ascertain the reason for, as well as the meaning of, particular provisions of the act. United States v. Union Pacific R. R., 91 U. S., 79; Preston v. Browder, 1 Wheat., 120; Aldrich v. Williams, 3 How., 24.
If Congress meant to apply other sections of the Judicial Code to section 162 (that loyalty as a fact was necessary to be proven by those aiding the Confederate cause), the act in question would have been purposeless. It would be an act on the statute book with practically no meaning, for the reason that the loyalists of the cotton-growing belts were *315 known to have availed themselves of the remedy afforded them, and the matter of pardon extended to others would destroy the construction given by the courts as to the effect of the proclamations of the President.
As showing the motives of the lawmakers, the court can also look to the occurrences surrounding the passage of the act known as the Bartlett amendment. Cong. Rec., 61st Cong., 3d sess.,‘p. 2163. In United, States v. Craig, 28 Fed. Rep., 798, the late Justice Brown (as district judge) declared that the motives and history of an act are matters of common knowledge. In Holy Trinity Church v. United States, 143 U. S., 463, this declaration was cited with approval. It was common knowledge that the war closed as a matter of fact, if not in legal contemplation, prior to June 1, 1865. That date was fixed in section 162 with knowledge that cotton taken from and after June 1, 1865, could not be used for any hostile purpose. With the dissolution of the remnants of the southern forces in April and the early part of May, 1865, the calm that came to the country was as pro1 found as the hush that fell upon Europe when, after Waterloo, the Allies marched upon Paris and remained long enough to reestablish the dynasty of the Bourbons. Intention to afford relief to a class could not be more plainly implied. Intention of the makers of an act is as much within the act as if it were within the letter; for whatever is implied in a statute, pleading, contract, or will is as much a part of it as that expressed. Babbitt's Case, 1 Black, 361.
But sections 159 and 161 have some meaning. The general rule is that courts must give force and effect to all parts of a statute if possible. Another rule arises when there is ambiguity, and in such cases the character of the statute determines for a strict or liberal construction. Section 294 of the Judicial Code provides that—
“ The provisions of this act, so far as they are substantially the same as existing statutes, shall be construed as continuations thereof, and not as new enactments, and there shall be no implication of a change of intent by reason of a change of words in such statute, unless such change of intent shall be clearly manifest.”
*316 In Sturges v. Crowninshield, 4 Wheat., 202, Marshall, Ch. J., said it would be dangerous to infer from extrinsic circumstances that a case for which the words of an instrument expressly provide shall be exempted from its operation; that where the different clauses of an instrument bear upon each other and would be inconsistent unless the natural and common import of words be varied, construction becomes necessary, and a departure from the obvious meaning of words is justifiable. In the matter before us it was known to the lawmakers that the courts had granted relief to disloyal owners of cotton where the statutes of limitations had not intervened by holding that proof of loyalty (as contradistinguished from innocence in law) was not essential to recovery. Amnesty became generally the substitute for the want of proof of loyalty.
In reenacting section 159 the intent can not be attributed to Congress to exclude disloyal claimants under section 162 or, for that matter, under any other act from the jurisdictions provided. Any such claimant may aver loyalty according to its legal effect without qualification or further avertment. If the plea be traversed, and the claimant has committed an offense within the purview of any proclamation of amnesty, the pleading may then show the claimant’s reliance upon the presidential proclamations. If the pleading sets up loyalty with the qualification, as in the present case, that amnesty had been extended, such plea is sufficient. Any petitioner declining to aver that he had at all times been loyal in fact, when at some time he had been disloyal in fact, brings himself within the meaning of the law by averring the qualification that he had committed acts which at one time were considered offenses, but which, by reason of presidential proclamations, had been blotted out.
In other words, where there is a general averment of loyalty without qualification, it devolves upon the petitioner either to prove the fact of loyalty or to plead the amnesty for whatever offense there was.
Congress have not undertaken to prescribe the evidence or the effect thereof on which the court may proceed to judgment where jurisdiction is granted. That was the ruling in *317 Klein’s case, ante. The language of section 159 is broad enough to include any violent opposition to the lawful authority of the Government, applies to aliens as well as citizens, and prescribes a certain general allegation relating as much to occurrences since the close of the Civil War as at any period before that time. In United States v. Gear, 3 How., 131, it was said that all statutes are perpetual unless limited to a particular time or until repealed by an act professing to repeal them, or by the necessary implication contained in a clause or section of another act directly bearing upon the particular matter of the first act. Section 159 seems to have been reenacted as a permanent statute having for its object the desire to prevent rebellion against the Federal authority for all time.
Numbers of ex-Confederates now living would probably decline to take an oath unqualified that they had at all times borne allegiance to the Government of the United States, because there is contained on the face of such a paper as much the statement of a fact as the recital of a legal conclusion resulting from the effect of amnesty. The court leaves this part of the case as it appears in the statement above.
In administering the abandoned or captured property act the Court of Claims may have to deal with cases where claims are made to funds in the Treasury from particular localities by conflicting interests, because the cotton from certain localities was intermingled after capture, the identity lost, and likelihood exists that the fund will prove insufficient to pay all in full. In such cases the court has the power to make the conflicting parties interplead and then to marshal and distribute the assets pro rata among those claimants where the fund is found to be insufficient.
In the delay likely to be created to meritorious suitors there is cause to regret that section 162 does not contain a limitation of time within which all suits must be brought.
Defendants’ motion to dismiss the petition is denied.