## CONRAD *v.* WAPLES.

1. The act of July 17, 1862 (12 Stat. 589), so far as it related to the confiscation of property, applied only to the property of persons who thereafter might be guilty of acts of disloyalty and treason; and it reached only the estate of the party for whose offences the property was seized.

2. Until some provision was made by law for the condemnation of property in land of persons engaged in the rebellion, the courts of the United States could not decree a confiscation of it, and direct its sale.

3. Such persons were not denied the right of contracting with and selling to each other; as between themselves, all the ordinary business could be lawfully carried on, except in cases where it was expressly forbidden by the United States, or would have been inconsistent with or have tended to weaken its authority.

4. The purpose of the United States to seize and confiscate the property of certain classes of persons engaged in the rebellion having been declared by the act of July 17, 1862, sales and conveyances of property subsequently made by them could only pass a title subject to be defeated, if the government should afterwards proceed for its condemnation. The fact that the property sold and conveyed was at the time within the territory occupied by the Federal troops, created no other legal impediment to the transfer.

5. The provision in that act, that "all sales, transfers, or conveyances" of property of persons therein designated shall be null and void, only invalidates such transactions as against any proceedings taken by the United States for the condemnation of the property. They are not void as between the parties, or against any other party than the United States. The case of *Corbett v. Nutt* (10 Wall. 464) cited on this point, and approved.

6. A sale by public act, before a notary within the insurrectionary territory, of land in the city of New Orleans by one enemy to another for a valuable consideration, previous to the passage of the Confiscation Act, passed the title to the purchaser, which was not affected by subsequent judicial proceedings for its condemnation for alleged offences of the vendor. The case of *Fairfax's Devisee v. Hunter's Lessee* (7 Cranch, 603) cited and approved.

7. An actual delivery of immovables in Louisiana is not essential to the validity of a sale of them made by public act before a notary. The law of the State considers the tradition or delivery of the property as accompanying the act.

ERROR to the Circuit Court of the United States for the District of Louisiana.

This was an action for the recovery of certain real property, described in the petition of the plaintiff, situated in the city of New Orleans, and of the rents and profits. The plaintiff claimed title to the premises by a conveyance from his father, Charles M. Conrad, made to himself and his brother on the 6th of May,

1862, and a subsequent conveyance to himself of his brother's interest. The conveyance of the father was made in settlement and discharge of certain obligations resting upon him under the laws of Louisiana, by reason of his having received, as the natural tutor of his children, property belonging to them as minor heirs of their deceased mother. It appears from the record that she died intestate, at New Orleans, in 1839, leaving the plaintiff and his brother her only heirs, and an estate valued at a sum over $35,000. The estate consisted principally of her separate property; a small portion was her share of the real property belonging to the matrimonial community. The surviving husband qualified, and was confirmed as the natural tutor of the children, and took charge of their property. The law of Louisiana imposes a general mortgage upon all the property of a tutor, to secure the interests of minors and his faithful execution of the trust, but gives him the right to substitute in place of it a special mortgage upon particular parcels of his property. The tutor here availed himself of this right at different times. The last special mortgage was executed in 1847, and, with other property, covered the premises in controversy. Previously to this, and in 1845, his indebtedness to his sons had been ascertained, and fixed by decree of the Probate Court at the sum of $36,757. This amount was subsequently increased.

No account of his administration was ever rendered by the tutor until May 6, 1862, when a settlement took place between him and his sons; and, in discharge of his obligations to them, he executed, before the recorder and *ex-officio* notary-public of the parish of St. Helena, a public act of sale, by which he sold and conveyed to them several lots situated in New Orleans, and among them the one in controversy in this case. This act of sale, which purports to have been recorded in the city of New Orleans on the 31st of the same month, the court refused to admit in evidence.

The defendant, Waples, in his answer, asserted title to the premises in controversy, under a deed to him by the marshal of the United States, executed in March, 1865, upon a sale under a decree of the District Court, rendered in February of that year, condemning and forfeiting the property to the United States, as that of Charles M. Conrad, in proceedings taken under

the Confiscation Act of July 17, 1862. The other defendants disclaimed title.

On the 1st of May, 1862, New Orleans passed into the possession of the army of the United States; and, on the 6th of the month, General Butler, commanding our forces there, issued a proclamation re-establishing the national authority in the city. The proclamation bears date on the 1st of May, but was not published until the 6th. The Conrads, father and sons, had left the city before it was captured. They had previously been engaged in the rebellion against the United States, — the father as a member of the Confederate Congress, and the sons as officers of the Confederate army, — and they continued in such rebellion until the close of the war. The parish of St. Helena was within the Confederate lines when the act of sale of May 6, 1862, was executed. When this act was offered in evidence by the plaintiff, objection was made to its introduction, on substantially the following grounds: 1. That the act was not a sale, but a giving in payment; and that no delivery of the property was or could be made, as the same was situated within the Federal lines, and the act was executed within the military lines of the Confederate States, where the parties were sojourning. 2. That it being admitted that the vendor and vendees had been before, and were at the date of the act, and afterwards, engaged in rebellion against the United States, and so continued until the end of the war, and that the act was passed within the Confederate lines, the property being situated within the Federal lines, the act of transfer was inoperative and void. 3. That such evidence would tend to contradict the decree of condemnation previously entered in the District Court, and set up by the defendant in his answer. 4. That, it being admitted that the grantor and grantees were enemies of the United States at the time the act was passed, the grantor was incompetent to complete the transfer of the property, the same being within Federal military lines. 5. That the copy of the act offered in evidence was not, by the statute of the State, admissible in evidence against any right set up by a third person, without being accompanied with proof that the same had been duly and legally registered in the proper office where the properties were situated. 6. That a state of war then existing, a deed exe.

cuted in the parish of St. Helena, within the Confederate lines, could not be legally recorded in the parish of Orleans, which at that date was within Federal military lines.

These several objections were sustained by the court, and the plaintiff excepted.

The plaintiff requested the court to instruct the jury substantially as follows : —

1st, That even if the Confiscation Act contained a prohibition against sales, transfers, and conveyances, made in good faith prior to its passage, such prohibition did not apply to transfers and conveyances wherein all parties to the same, vendor and vendees, were equally engaged in rebellion against the United States, and, consequently, where the property conveyed or transferred would be as liable to confiscation in the hands of the vendees as in the hands of the vendor.

2d, That all that was seized, and all that could be seized, condemned, and sold under the judgment or decree of the United States District Court for the Eastern District of Louisiana, in the proceedings against the property of Charles M. Conrad, on which judgment or decree, and the sale made in pursuance thereof, the defendant bases his claim to the premises in controversy in this cause, was the title, right, and estate of said Charles M. Conrad, whatever the same might have been, to endure only during his life, in and to the property libelled and condemned, and the right, property, and estate therein of no other person or persons whatsoever.

3d, That the United States, by the proceedings and decree of condemnation, succeeded only to the rights of said Charles M. Conrad to said property, whatever the same might be, to endure only during his life ; and that the decree, and marshal's sale to defendant thereunder, had no other effect than to transfer such rights as the United States acquired by the decree, and did not disturb or affect the rights of any other person or persons to the property, or any part thereof ; and that if, at the time of the seizure, proceedings, and decree, Charles M. Conrad had no rights and estate in the property involved, the United States acquired no rights and estate therein ; and the marshal's sale of the property transferred no interest or estate therein to the defendant, the purchaser at the sale.

But the court refused to give the instructions as prayed, or any of them, and the plaintiff excepted.

At the request of the defendants, the court instructed the jury that, the plaintiff having offered no evidence to show title in himself, it was their duty to return a verdict for the defendants; to which instruction the plaintiff excepted.

The jury found for the defendants; and, judgment having been entered on the verdict, the plaintiff brought the case here on writ of error.

*Mr. L. L. Conrad* for the plaintiff in error.

*Mr. Thomas J. Durant, contra.*

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

The questions presented for our determination relate to the admissibility and effect of the act of sale of May 6, 1862, and to the subsequent condemnation and sale in the confiscation proceedings. Numerous exceptions were taken to the rulings of the Circuit Court in admitting and rejecting evidence, and in giving and refusing instructions to the jury; but we do not deem it important to notice them in detail. What we have to say upon the Confiscation Act, the title which passed by a condemnation and sale under it, and the power of enemies to sell and convey to each other their interest in real property situated within the lines of the other belligerent, will sufficiently express our judgment upon the questions involved, and serve to guide the court below in any subsequent proceedings.

The law of July 17, 1862, so far as it related to the confiscation of property, applied only to the property of persons who thereafter might be guilty of acts of disloyalty and treason. It carefully excluded from its application the property of persons who, previous to its passage, may have committed such acts. It left the door open to them to return to their allegiance, without molestation for past offences. The fifth section, with the exception of the third clause, directed the seizure of property only of persons who might *thereafter* hold an office or an agency under the government of the Confederacy, or of one of the States composing it, or might *thereafter* act as an officer in its army or navy, or who, owning property in any loyal State or

Territory, or in the District of Columbia, might *thereafter* give aid and comfort to the rebellion; and the joint resolution of the two houses of Congress, passed in explanation and limitation of the law, removed that exception. That resolution declared that the third clause of that section should be so construed as not to apply to any act or acts done prior to its passage. The sixth section, which provided for the seizure of the property of persons other than those named in the previous section, who, being engaged in armed rebellion, did not, within sixty days after the warning and proclamation of the President, cease to aid, countenance, and abet the rebellion, declared that "all sales, transfers, and conveyances of any such property *after* the expiration of the said sixty days," should be null and void. 12 Stat. 627.

Nothing done, therefore, by the elder Conrad when he made his sale to his sons, which was before the passage of the Confiscation Act, affected his title or power of disposition. It is true, he was then engaged in the rebellion, as a member of the Confederate Congress, and giving constant aid and comfort to the insurrectionary government. But, until some provision was made by law, the courts of the United States could not decree a confiscation of his property, and direct its sale. This follows from the doctrine declared in *Brown* v. *The United States*, reported in the 8th of Cranch. In that case the question arose, whether certain property of the enemy, found on land at the commencement of hostilities with Great Britain in 1812, could be seized and condemned as a consequence of the declaration of war. And it was held that it could not be condemned, without an act of Congress authorizing its seizure and confiscation. The court said that it was conceded that war gives to the sovereign the right to take the persons and confiscate the property of enemies, wherever found; adding, that the mitigation of this rigid rule, which the humane and wise policy of modern times has introduced into practice, cannot impair the right, though it may more or less affect its exercise. "That," said the court, "remains undiminished, and when the sovereign authority shall choose to bring it into operation, the judicial department must give effect to its will. But, until that will shall be expressed, no power of condemnation can exist in the court."

The only acts of Congress providing for the confiscation

of property of persons engaged in the rebellion are those of Aug. 6, 1861, and of July 17, 1862. That of 1861 applied only to property acquired with intent to use or employ the same, or to suffer the same to be used or employed, in aiding or abetting the insurrection, or in resisting the laws, and did not touch the property in controversy here. And the act of 1862, as already stated, did not authorize a seizure and confiscation for past acts. It might have done so, on the simple ground that the owner of the property seized was a public enemy, without reference to the time he became such; but Congress otherwise provided, and its will furnishes the rule by which to determine the rights of the elder Conrad at the time he disposed of his property.

The statute not only did not recognize past acts as grounds for confiscation, but it reached only the estate of the actual owner at the time the property was seized. It might, undoubtedly, have provided for the confiscation of the entire property, from its being within the enemy's country; but the legislature did not so enact. Congress limited the exercise of its power of confiscation to those cases where the owners were officers or agents of the insurrectionary organization, or of one of the States composing it, or commanding in its army or navy; or where, while holding property in a loyal State or Territory, or in the District of Columbia, they gave aid and comfort to the rebellion; or where, not being within these classes, but being in arms in support of the insurrection, they refused, for sixty days after the warning and proclamation of the President, to return to their allegiance. It was the seizure and confiscation of " the estate, property, money, stocks, credits, and effects," of the persons thus specially designated that the act authorized; not the seizure and confiscation of property in enemies' territory, or of enemies generally. It was at the estate and interest which belonged to offending persons of the classes mentioned that the act aimed, nothing more. Proceedings under the act, therefore, affected only their estate and interest in the property seized. It was so held by this court in *Day* v. *Micou*, reported in the 18th of Wallace, where the effect of an adjudication and sale under the act was the direct point in judgment. And this conclusion was not considered as at all affected by the fact, that

after the seizure proceedings *in rem* were to be instituted for the condemnation of the property. The question, said the court, remained, what was the *res* against which the proceedings were directed; and this, it answered, was that which was seized and brought within the jurisdiction of the court. "A condemnation in a proceeding *in rem*," it added, speaking through Mr. Justice Strong, "does not necessarily exclude all claim to other interests than those which were seized. In admiralty cases and in revenue cases a condemnation and sale generally pass the entire title to the property condemned and sold. This is because the thing condemned is considered as the offender or the debtor, and is seized in entirety. But such is not the case in many proceedings which are *in rem*. Decrees of courts of probate or orphans' courts directing sales for the payment of a decedent's debts, or for distribution, are proceedings *in rem*. So are sales under attachments or proceedings to foreclose a mortgage *quasi* proceedings *in rem*, at least. But in none of these cases is any thing more sold than the estate of the decedent, or of the debtor or the mortgagor, in the thing sold. The interests of others are not cut off or affected."

If we apply these views to the case at bar, we must hold that there was nothing in the proceedings and decree under the Confiscation Act against the property of the elder Conrad, upon which the defendant in his answer relies, which could in any respect affect the rights of the younger Conrads to the lands conveyed to them before that act was passed, unless the fact that the parties to the conveyance were, at the time of the sale, engaged in the rebellion against the United States, and were within the enemies' country, rendered it unlawful for the father to transfer and the sons to receive the title to real property situated within the Federal lines. The illegality of the sale on this ground was insisted upon in the court below, and the position was there sustained. But we do not think the position at all tenable. The character of the parties as rebels or enemies did not deprive them of the right to contract with and to sell to each other. As between themselves, all the ordinary business between people of the same community in buying, selling, and exchanging property, movable and immovable, could be lawfully carried on, except in cases where it was expressly forbidden by

the United States, or where it would have been inconsistent
with or have tended to weaken their authority. It was com-
mercial intercourse and correspondence between citizens of one
belligerent and those of the other, the engaging in traffic be-
tween them, which were forbidden by the laws of war and by the
President's proclamation of non-intercourse. So long as the
war existed, all intercourse between them inconsistent with
actual hostilities was unlawful. But commercial intercourse
and correspondence of the citizens of the enemy's country
among themselves were neither forbidden nor interfered with,
so long as they did not impair or tend to impair the supremacy
of the national authority or the rights of loyal citizens. No
people could long exist without exchanging commodities, and,
of course, without buying, selling, and contracting. And no
belligerent has ever been so imperious and arbitrary as to at-
tempt to forbid the transaction of ordinary business by its
enemies among themselves. No principle of public law and
no consideration of public policy could be subserved by any
edict to that effect; and its enforcement, if made, would be
impossible. If, then, intercourse between the Conrads, father
and sons, they being all enemies, was not unlawful; if between
them contracts for the purchase and sale of property, in respect
to which there was no special interdict, would have been bind-
ing, — the sale in the case at bar can only be impeached, if at all,
by reason of the situation of the property within the Federal
lines. And from that circumstance it could not be impeached,
unless the sale, if upheld, in some way frustrated the enforce-
ment of the right of seizure and confiscation possessed by the
United States. It may be admitted that the right of a bellig-
erent to confiscate the property of enemies found within its
territory cannot be impaired by a sale of the property during
the war, but it is not perceived that on any other ground the
sale could be invalidated. A conveyance in such case would
pass the title subject to be defeated, if the government should
afterwards proceed for its condemnation. And to declare this
liability was the object of the provision in the Confiscation Act,
enacting that " all sales, transfers, and conveyances " of prop-
erty of certain designated parties made subject to seizure should
be null and void. The invalidity there declared was limited

and not absolute. It was only as against the United States that the transfers of property liable to seizure were null and void. They were not void as between private parties, or against any other party than the United States. This was so held in the case of *Corbett* v. *Nutt*, reported in the 10th of Wallace. There a devise (which for the purpose of the case was treated as included within the terms "sales, transfers, and conveyances") of property situated in the District of Columbia, made by a resident enemy in the State of Virginia to a person as trustee, who also resided in that State, and held office under the Confederate government, was held to pass a title good against all the world except the United States. The seizure and confiscation of property of persons engaged in the rebellion, and the appropriation of the proceeds to support the army and navy, were supposed — whether wisely or unwisely is immaterial — to have a tendency to insure the speedy termination of the rebellion; and it was to prevent the provisions enacted to enforce the confiscation from being evaded by the parties whose property was liable to seizure, that sales, transfers, and conveyances of it were declared invalid. As stated by the court, " They were, null and void as against the belligerent or sovereign right of the United States to appropriate and use the property for the purpose designated, but in no other respect, and not as against any other party. Neither the object sought nor the language of the act requires any greater extension of the terms used. The United States were the only party who could institute the proceedings for condemnation, the offence for which such condemnation was decreed was against the United States, and the property condemned or its proceeds went to their sole use. They alone could, therefore, be affected by the sale." And the court added, that any other construction would impute to the United States a severity in their legislation entirely foreign to their history. If the sale to the younger Conrads had been made after the passage of the Confiscation Act, it would not have prevented the title of the elder Conrad from vesting by the decree of condemnation in the United States. But, having been made previously, it was not impaired by the act.

An actual delivery of the property to the vendees at the time was not essential to the validity of the sale, it having been

made by public act before a notary. The code of the State declares that an obligation to deliver an object which is particularly specified is perfect by the mere consent of the parties, and renders the creditor the owner; and, further, that this rule "is without any exception, as respects immovables, not only between the parties, but as to all the world, provided the contract be clothed with the formalities required by law, that it is *bona fide*, and purports to transfer the ownership of the property." Art. 1914. The code also declares that "the law considers the tradition or delivery of immovables as always accompanying the public act which transfers the property." Art. 2455; *Lallande* v. *Lee*, 9 Rob. (La.) 514; *Flynn* v. *Moore*, 4 La. Ann. 400; *Ellis* v. *Prevost et al.*, 13 La. 235–237. We are of opinion, therefore, that the act of sale made on the 6th of May, 1862, was unaffected by the subsequent confiscation proceedings, and should have been admitted in evidence.

This case is much stronger than that of *Fairfax's Devisee* v. *Hunter's Lessee*, reported in the 7th of Cranch, which received great consideration by this court. There a devise to an alien enemy resident in England, made during our Revolutionary War by a citizen of Virginia, and there residing at the time, was sustained, and held to vest a title in the devisee which was good until office found. "It is clear by the common law," said Mr. Justice Story, speaking for the court, "that an alien can take lands by purchase though not by descent; or, in other words, he cannot take by the act of law, but he may by the act of the party. This principle has been settled in the Year Books, and has been uniformly recognized as sound law from that time. Nor is there any distinction whether the purchase be by grant or by devise. In either case, the estate vests in the alien, not for his own benefit, but for the benefit of the State; or, in the language of the ancient law, the alien has the capacity to take but not to hold lands, and they may be seized into the hands of the sovereign. But, until the lands are so seized, the alien has complete dominion over the same." And, continues the learned justice, "We do not find that in respect to these general rights and disabilities there is any admitted difference between alien friends and alien enemies. During the war, the property of alien enemies is subject to confiscation *jure belli*, and their civil

capacity to sue is suspended.    But as to capacity to purchase, no case has been cited in which it has been denied; and in *The Attorney-General* v. *Wheeden and Shales* (Park. Rep. 267), it was adjudged that a bequest to an alien enemy was good, and after a peace might be enforced.    Indeed, the common law in these particulars seems to coincide with the *jus gentium.*"

If an alien enemy can, by devise or purchase from a loyal citizen or subject, take an estate in the country of the other belligerent and hold it until office found, there would seem to be no solid reason for refusing a like efficacy to a conveyance from one enemy to another of land similarly situated.[1]    A different doctrine would unsettle a multitude of titles passed during the war between residents of the insurrectionary territory temporarily absent therefrom whilst it was dominated by the Federal forces.    Such residents were deemed enemies by the mere fact of being inhabitants of that territory, without reference to any hostile disposition manifested or hostile acts committed by them.    In numerous instances, also, transfers of property were made in loyal States bordering on the line of actual hostilities, by parties who had left those States and joined the insurgents. This was particularly the case in Missouri and Kentucky.    No principle of public policy would be advanced, or principle of public law sustained, by holding such transfers absolutely void, instead of being merely inoperative as against the right of the United States to appropriate the property *jure belli;* on the contrary, such a holding would create unnecessary hardship, and therefore add a new cruelty to the war.

It follows from the views expressed that the judgment of the court below must be reversed and the cause remanded for a new trial; and it is

*So ordered.*

MR. JUSTICE CLIFFORD dissented.    His opinion applies to this and to the subsequent case of *Burbank* v. *Conrad.*    It will be found on page 293.

_____

[1] See the able and exhaustive opinion of the Supreme Court of Massachusetts in *Kershaw* v. *Kelsey,* delivered by Mr. Chief Justice Gray, 100 Mass. 561.