## MUNICH REINSURANCE CO. v. FIRST RE-INSURANCE CO. OF HARTFORD.

(Circuit Court of Appeals, Second Circuit. April 6, 1925.)

No. 166.

**1. War ⊚═⫸12—Trading with the Enemy Act not terminated by cessation of hostilities, joint resolution, or proclamation of peace.**

Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.) was not terminated by the cessation of hostilities, by Joint Resolution July 2, 1921, declaring state of war between Germany and United States at an end, or by President's proclamation of peace.

**2. Evidence ⊚═⫸46—Court may take judicial notice of executive orders prescribing Alien Property Custodian's duties.**

The federal courts may take judicial notice of the executive orders prescribing duties of the Alien Property Custodian.

**3. War ⊚═⫸12—Alien enemy corporation not entitled to accounting for payment from confiscated property of alien, made by Alien Property Custodian to domestic corporation.**

Where stock in domestic reinsurance corporation owned by German reinsurance corporation was seized by Alien Property Custodian, under Trading with the Enemy Act Oct. 6, 1917, § 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), alien corporation *held* not entitled to sue for accounting against domestic corporation, to which Alien Property Custodian paid, out of proceeds realized by sale of stock, a claim against the German corporation; the act giving no right of action by enemy alien and the Treaty of Berlin, proclaimed by the President November 14, 1921, relegating German nationals to claim against their own government for compensation for confiscated properties.

**4. Evidence ⊚═⫸39—Court will take judicial notice of Treaty of Berlin.**

The court will take judicial notice of Treaty of Berlin, signed by the United States and Germany on August 25, 1921, ratified by both parties, and proclaimed by proclamation by the President of the United States on November 14, 1921.

**5. War ⊚═⫸15—Alien enemy reinsurance company not entitled to continue business under Trading with the Enemy Act, in absence of special licenses.**

A German reinsurance company *held* not entitled to continue to do business after declaration of war under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.), notwithstanding section 4 (section 3115½bb), without securing license from the President.

**6. War ⊚═⫸15—German reinsurance company not entitled to do business under President's proclamation.**

German reinsurance corporation *held* not entitled to continue to do business after declaration of war under President's proclamation of April 6, 1917, which dealt exclusively with United States branches of German companies, established pursuant to laws of various states, in absence of showing that it had a United States branch or department.

**7. War ⊚═⫸10(1)—Executed contract of domestic reinsurance company to take over contracts of German reinsurance company not rescinded.**

An executed contract of domestic reinsurance company to take over obligations of German reinsurance company subsequently accruing under their contracts *held* not terminated by declaration of war or rescinded by domestic corporation in presenting claim to Alien Property Custodian in possession of German company's property for obligations due prior to contract which by its terms were not assumed.

**8. War ⊚═⫸12—Alien enemy corporation held to have no interest in property seized by Alien Property Custodian.**

A German reinsurance corporation *held* to have no further interest in stock in domestic reinsurance corporation after seizure by Alien Property Custodian, and it could neither reclaim stock from purchaser from Custodian, nor reclaim proceeds of sale, nor did it have any interest in use to which proceeds were devoted.

**9. War ⊚═⫸29—Trading with the Enemy Act contemplated confiscation of property owned by enemy, and not custodianship only.**

Trading with the Enemy Act Oct. 6, 1917, § 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), *held* to contemplate confiscation of property owned by enemy, and not mere custodianship, especially in view of Act 1917, §§ 6, 7(e), being Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½cc, 3115½d, notwithstanding section 9, being section 3115½e.

Appeal from the District Court of the United States for the District of Connecticut; Edwin S. Thomas, Judge.

Action by the Munich Reinsurance Company against the First Reinsurance Company of Hartford. Decree for defendant (300 F. 345), and plaintiff appeals. Affirmed.

The Munich Reinsurance Company, the complainant herein, is a corporation organized under the laws of the kingdom of Bavaria, and from October, 1898, to November, 1918, it was engaged in the business of reinsurance in the United States of America, and had offices in the United States, through which it transacted a part of its business in the United States, and until the year 1914 it also maintained an office in the city of London, through which it transacted a part of its

American business. The respondent is a corporation organized under the laws of the state of Connecticut, and it has its principal place of business in the city of Hartford in the said state. It also is engaged in the business of reinsurance.

It appears that in 1912 the complainant caused the respondent to be organized and incorporated, with a capital of $500,000 and a surplus of $500,000. The complainant subscribed and paid for $450,500 par value of the stock of the respondent company; the directors of the latter holding the balance of the stock. It also appears that prior to the World War there existed between these two companies agreements, known as treaties of reinsurance, pursuant to which the Connecticut corporation automatically ceded to the complainant all or parts of reinsurance taken by it under its reinsurance treaties with sundry American and Canadian companies; and on or about March 31, 1917, the two companies, in anticipation of a state of war, stopped doing new business inter se. All reinsurances previously retroceded by the Connecticut company to the German company remained obligations of the latter, but no new business was to be taken over by it from the former. At the close of the war, and growing out of the relations which existed between these two concerns, the complainant filed a bill in equity against the respondent, in which it asked for an accounting and certain other relief, as will presently more fully appear.

The bill alleged that the complainant was engaged in the business of reinsurance in the United States, and that prior to March 31, 1917, there existed between the complainant and respondent various agreements and contracts whereby the latter automatically ceded to the former all or parts of reinsurance assumed by the respondent under reinsurance contracts and treaties which it had entered into with various American and Canadian insurance companies, and among them with the Home Insurance Company of New York, with respect to the insurance of automobiles. It was also alleged that under the terms of the agreement a one-fifth share of the automobile business of the Home Insurance Company was automatically reinsured in the respondent, and that by an arrangement between the respondent and the complainant the whole of said one-fifth share was retroceded to the complainant; that the said reinsurance treaty between the Home Insurance Company and the respondent differed from the ordinary reinsurance treaty, in that the business was never reported by the Home

Insurance Company to the respondent upon bordereaux, as is usually the case, but settlements between the two, both as to premiums and losses, were upon accounts rendered between the companies, upon which neither premiums received nor losses paid were itemized, and neither the respondent nor the complainant had in its possession, in connection with said reinsurance and retrocessions, any details as to the individual risks, the premiums paid thereon, or losses paid with respect thereto.

It then went on to allege that on March 31, 1917, at which time the entry of the United States into the World War was imminent, an arrangement was entered into between complainant and respondent whereby all retrocessions, contracts, and agreements between them were canceled as of that date, and the respondent took over and acquired the full beneficial interest in and to each of the treaties and contracts of reinsurance then in force between it and the American and Canadian insurance companies, and thereafter the respondent ceased to retrocede any of said business to the complainant, but retained the entire business for its own account, receiving all premiums paid with respect thereto by the several direct writing companies, and paying its due proportion of the losses as incurred, that the arrangement herein alleged between the complainant and the respondent, whereby all retrocession agreements and contracts then in force between the companies were canceled and terminated, included the said automobile insurance business of the Home Insurance Company of New York. It alleged the seizure on March 15, 1918, by the Alien Property Custodian, of the complainant's stock in the respondent corporation as enemy property, and that in March, 1920, that official sold and transferred the said stock to certain citizens of the United States, to whom new certificates of stock were issued in place of the old certificates, which he caused to be canceled, and that the persons who thus acquired the stock have ever since exercised control over the affairs of the respondent corporation.

It is further alleged that the respondent corporation presented to the Alien Property Custodian, for allowance and payment out of the moneys and assets in his possession or under his control belonging to the complainant, a claim of $50,000 as due to respondent for moneys which it had disbursed for automobile losses and expenses relating thereto under the before-mentioned automobile reinsurance treaty between it and the Home Insurance Company. It proceeded to

make certain allegations as to the ground upon which the respondent based its claim, which allegations the respondent in its answer absolutely denied, which are without any support in the record, and which the Custodian must have found contrary to the facts. Then the bill alleged that the respondent, by presenting the above claim to the Custodian, "elected to rescind" the agreement of March 31, 1917, heretofore referred to, whereby all premiums paid with respect to the business of reinsurance were to be retained by respondent, and all losses sustained thereunder were to be paid by it.

The bill, after stating that the Custodian, on October 20, 1922, without the complainant's consent, paid to the respondent out of the assets of complainant, then in his hands or under his control, the sum of $49,333.12, alleged that by virtue of the election of the respondent to rescind the agreement of March 31, 1917, the complainant was entitled to treat all retrocession agreements and contracts theretofore existing between it and respondent, as continuing and being in full force and effect, and the money so paid by the Custodian to said respondent as money wrongfully received by the latter, and for which it is accountable to the complainant. It also alleged that, because the respondent rescinded the agreement of March 31, 1917, by the presentation of its claim to the Custodian, the complainant had the right to consider that none of the contracts between the complainant and respondent existing on March 31, 1917, were terminated by that agreement, and it alleged that out of these contracts the respondent obtained large profits for which it is liable in an accounting, and a decree for such an accounting was prayed.

The answer, which the respondent filed, admitted some of the allegations of the complaint, and denied others. It admitted that there were in force on March 31, 1917, various reinsurance contracts which existed between the respondent and the American and Canadian companies, and under which reinsurances were on the date mentioned being retroceded to the complainant in whole or in part. It specifically stated with what companies such contracts existed, there being 22 of such treaties. They covered fire, accident, and health, fidelity and suretyship, burglary, steam boilers and fly wheels, and lives, and in the case of the Home Insurance Company the treaty covered automobile insurance. The answer denies that the respondent ever consented to a cancellation of the complainant's liability to it for losses on Home Insur-

ance automobile account, which losses had occurred after April 1, 1917, and were chargeable against the complainant on account of cessions to the latter prior to April 1, 1917, and the premiums for which payment had been received by complainant.

The answer admitted the allegations in the bill as to the seizure and sale by the Custodian of the shares of stock owned by the complainant in the respondent company, and it stated the number of shares so sold was 4,-505, and that the amount for which they were sold was $788,375, which was at the rate of $175 per share; and out of the proceeds so realized, and after hearing both complainant and respondent, the Custodian found that the amount of the losses paid by the respondent on the Home Insurance Automobile account was $54,002.76, and that there was due from it to the complainant the sum of $4,669.64, leaving a balance of $49,333.12 as the amount to which the respondent was entitled, and which the Custodian paid in full settlement of the claim. The answer concluded with the prayer that the bill be dismissed, with costs.

The District Judge, in dismissing the bill, wrote an opinion, in which he stated that he found nothing in the facts which amounted to a rescission of the agreement of March 31, 1917, and held that the complainant clearly had no interest in the fund sought to be recovered in this suit.

Cumings & Lockwood, of Stamford, Conn., and Hartwell Cabell, of New York City (Raymond Hackett, of Stamford, Conn., of counsel), for appellant.

Robinson, Robinson & Cole and Gross, Gross & Hyde, all of Hartford, Conn. (Lucius F. Robinson and Charles Welles Gross, both of Hartford, Conn., of counsel), for appellee.

Before ROGERS, MANTON, and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The question which this case raises is whether a German corporation, which during the World War was an alien enemy, is entitled, now that the war has been terminated, to maintain a suit for an accounting against a domestic corporation, to which the Alien Property Custodian paid, out of proceeds realized by a sale of the latter's shares of stock in the former, a claim against the German corporation, and which had been seized and sold by him as enemy property by virtue of the powers vested in him by law, which also authorized him to liquidate claims against the fund. The Dis-

trict Judge has answered the question in the negative, and has dismissed the complainant's bill. We think the dismissal of the bill was required by law, and will proceed to state the reasons which lead us to that conclusion.

The United States declared war against Germany on April 6, 1917, and on October 6, 1917, Congress passed the Trading with the Enemy Act. 40 Stat. pt. 1, c. 106, p. 411 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.). Section 2 of the act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa) declared that the word "enemy," as used therein, should be deemed to mean "any individual, partnership, or other body of individuals, of any nationality, resident within the territory * * * of any nation with which the United States is at war, or resident outside the United States. and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory." The word "person," as used in the act was defined in the same section as meaning "an individual, partnership, association, company, or other unincorporated body of individuals, or corporation or body politic."

Section 3 of the act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½b) made it unlawful for any person in the United States, except with a license of the President, to trade, or attempt to trade, either directly or indirectly, with or on account of, or on behalf of, or for the benefit of any enemy, or ally of an enemy. The words "to trade" were defined as meaning among other things:

"(c) Enter into, carry on, complete, or perform any contract, agreement, or obligation.

"(d) Buy or sell, loan or extend credit, trade in, deal with, exchange, transmit, transfer, assign, or otherwise dispose of, or receive any form of property.

"(e) To have any form of business or commercial communication or intercourse with."

Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa.

And it was also made unlawful for any person to transmit any form of communication intended to be delivered directly or indirectly to any enemy.

Section 4 of the act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½bb) provided that every enemy or ally of enemy insurance or reinsurance company, and every enemy or ally of enemy, doing business within in the United States through an agency or branch office, might apply to the President for a license to continue to do business, and the President was authorized to grant or refuse such a license for such period of time and on such conditions as he deemed necessary for the safety of the United States. But the complainant in its bill does not allege that it at any time obtained or applied for such a license.

Section 6 of the act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½cc) authorized the President to appoint an official, to be known as the Alien Property Custodian, and empowered him to receive "all money and property in the United States due and belonging to an enemy * * * which may be paid, conveyed, transferred, assigned, or delivered to said Custodian under the provisions of this act, and to hold, administer, and account for the same under the general direction of the President and as provided in this act."

The act of 1917 vested in the Custodian "all the powers of a common-law trustee" in respect of the property seized. See section 12 of the act. 40 Stat. pt. 1, c. 106, p. 423. And the Act of March 28, 1918, 40 Stat. pt. 1, c. 28, p. 459 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), amended the Trading with the Enemy Act to read as follows:

"The Alien Property Custodian shall be vested with all of the powers of a common-law trustee in respect of all property, other than money, which has been or shall be * * * conveyed, transferred, assigned, delivered, or paid over to him in pursuance of the provisions of this act, and, in addition thereto, acting under the supervision and direction of the President, and under such rules and regulations as the President shall prescribe, shall have power to manage such property and do any act or things in respect thereof or make any disposition thereof or of any part thereof, by *sale* or otherwise * * * *as though he were the absolute owner thereof.*" 40 Stat. pt. 1, c. 28, p. 460.

[1] The Trading with the Enemy Act has been held to be a constitutional exercise of the war power. Stoehr v. Wallace, 255 U. S. 239, 41 S. Ct. 293, 65 L. Ed. 604. The act was not terminated by the cessation of hostilities, by the joint resolution declaring the state of war between Germany and the United States at an end, or by the President's proclamation of peace. Commercial Trust Co. v. Miller, 262 U. S. 51, 43 S. Ct. 486, 67 L. Ed. 858.

[2] It thus appears that under the act of 1917 and the amendatory act of 1918 the Alien Property Custodian was empowered to act "under the supervision of the President, and under such rules and regulations as the President shall prescribe." And the court is entitled to take judicial notice of the executive orders prescribing the duties of the Alien Property Custodian. The order issued by the President on November 12, 1918, related to the duties of the Custodian respecting insurance companies. It specifically declared that the Custodian should have power, among other things, "to sell or otherwise dispose of * * * any and all property, other than money, of any insurance company heretofore doing business within the United States which has been or shall be conveyed * * * or paid over to him, or which shall be seized by him," pursuant to the Trading with the Enemy Act.

The order also gave him, after taking possession of the property, powers of custody, management, administration, and control over the business, property, and assets so taken. It specifically gave him power and authority "to pay all leases, claims, premiums, adjustment charges, rents, interest and other accounts and liens or charges * * * and to settle, compromise and adjust claims, demands and choses in action." It also provided that he should have power "generally to manage, administer, preserve, conduct, operate and control such business and any or all parts or parcels and assets thereof as though the absolute owner. * * *"

And in a subsequent provision (paragraph 5) it is declared that he shall have "full power and discretion with respect to the business, property and assets of any insurance company * * * which has been or shall be seized by him, and may liquidate, reinsure or retrocede, or sell or otherwise dispose of in accordance with" the Trading with the Enemy Act as amended, "the said business in whole or in part at such times and upon such terms as he may determine. * * *"

The provision empowering the Custodian to pay claims due from an alien enemy is set forth in section 9 of the Act of 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e):

"That any person, not an enemy, or ally of enemy, claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder, and held by him or by the Treasurer of the United States, or to whom any debt may be owing from an enemy, or ally of enemy, whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder, and held by him or by the Treasurer of the United States, may file with the said custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; and the President, if application is made therefor by the claimant, may, with the assent of the owner of said property and of all persons claiming any right, title, or interest therein, order the payment, conveyance, transfer, assignment or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or of the interest therein to which the President shall determine said claimant is entitled: Provided, that no such order by the President shall bar any person from the prosecution of any suit at law or in equity against the claimant to establish any right, title or interest which he may have in such money or other property. If the President shall not so order within sixty days after the filing of such application, or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may, at any time before the expiration of six months after the end of the war, institute a suit in equity in the District Court of the United States for the district in which such claimant resides, or, if a corporation, where it has its principal place of business (to which suit the Alien Property Custodian or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if suit shall be so instituted then the money or other property of the enemy, or ally of enemy, against whom such interest, right, or title is asserted, or debt claimed, shall be retained in the custody of the Alien Property Custodian, or in the Treasury of the United States, as provided in this act, and until any final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment or conveyance, transfer, assignment, or delivery by the defendant or by the Alien Property Custodian or Treasurer of the United States on order of the court, or until final judgment or decree shall be entered against the claimant, or suit otherwise terminated.

"Except as herein provided, the money or other property conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian shall not be liable to lien, attach-

ment, garnishment, trustee process, or execution, or subject to any order or decree of any court.

"This section shall not apply, however, to money paid to the alien property custodian under section ten hereof."

40 Stat. pt. 1, c. 106, p. 419.

[3] The above section relates only to claims made by any person "not an enemy or ally of an enemy." There is no authorization of any suit by an "enemy or ally of an enemy" anywhere therein. The rights of "any enemy" to any money or property received and held by the Alien Property Custodian are governed by the provision contained in section 12 of the act of 1917 hereinbefore referred to, and which declared that after the end of the war any claim of any enemy "to any money or other property" received and held by the Custodian or deposited in the Treasury "shall be settled as Congress shall direct." Congress has not yet directed. If the complainant can maintain this suit to recover from the defendant the money paid to it by the Custodian out of the proceeds realized by him from the sale of the complainant's enemy property in the United States, it can, to that extent at least, and without any authorization of Congress, recover back so much of the proceeds as the Custodian paid over to the defendant. This we think complainant cannot do. As we understand the legislation of Congress, the intention was that the acts of the Custodian respecting "enemy owned property" should be the acts of an absolute owner—the enemy owner retaining no rights therein, but only a right, after the end of the war, to have his rights settled "as Congress shall direct," and which, as we have said, Congress has not yet directed.

This complainant, at the time the Custodian seized and sold its shares of stock in the defendant company, was, in our opinion, divested of all right, title, or interest in the property, and in the proceeds realized by the subsequent sale of the property. It could not thereafter reclaim the property from the person to whom it was sold. It had no right to or interest in the proceeds of the sale, and no right to reclaim any portion thereof which the Custodian paid over to a third person in settlement of a claim which such person had against the enemy. The original enemy owner is without right to question the seizure, or sale, or disposition made of the proceeds of the sale.

Section 9, as already stated, was not for the benefit of an enemy. It relates, not to the rights of enemies in the property held by the Custodian, but to the rights or claims of other than enemies against such property. But it conferred on any person "not an enemy," and who claimed any interest, right, or title in the property in the possession of the Custodian, or who claimed that any debt was owing to him from an enemy whose property was in the possession of the Custodian, the right to file with that official a notice of his claim under oath, and in such cases the President might, upon the application of the claimant, "with the assent of the owner of said property and of all persons claiming any right, title, or interest therein," order payment to be made to the claimant to the extent of his interest therein.

The words "Provided, that no such order by the President shall bar any person from the prosecution of any suit at law or in equity against the claimant" to establish his right or interest therein, cannot include the original enemy owner of the property, for we have seen that under the provisions of section 9, as drawn, there was no power to pay claimants, except "with the assent of the owner of said property." After his assent was once given, it was, of course, final, and would estop him thereafter from instituting a suit against the claimant to recover back the property paid with his assent. The act of 1918 enlarged the power of the Custodian to deal with the property of an enemy which he had taken into possession, conferring upon him the power of an absolute owner. But it cannot be claimed that this enlargement of the Custodian's powers to deal with an enemy's property had the effect of enlarging the scope of section 9 beyond what it had when Congress adopted it. As that section did not give the enemy owner of the seized property a right of action against a "claimant," and as no such right is given in the act of 1918, we confess ourselves at a loss to see whence the right is derived.

[4] There is another phase of the question herein involved to which we think it proper to refer. This court is entitled to take judicial notice of the Treaty of Berlin, signed between the United States and Germany on August 25, 1921. That treaty was ratified by both parties and was proclaimed by the proclamation of the President of the United States on November 14, 1921. 42 Stat. pt. 2, p. 1939. According to that treaty the war between the United States and Germany was terminated on July 2, 1921. Article I of the Treaty declares that "Germany undertakes to accord to the United States, and the United States shall have and enjoy, all the rights, privileges, indemnities,

reparations or advantages specified" in the Joint Resolution of the Congress of the United States of July 2, 1921 (42 Stat. 105), "including all the rights and advantages stipulated for the benefit of the United States in the Treaty of Versailles which the United States shall fully enjoy notwithstanding the fact that such treaty has not been ratified by the United States."

The Joint Resolution of July 2, 1921, above referred to, after declaring the state of war between the two countries at an end, provided in its second section that in making that declaration, and as a part of it, "there are expressly reserved to the United States of America and its nationals any and all rights, privileges, indemnities, reparations, or advantages, together with the right to enforce the same, to which it or they have become entitled under the terms of the Armistice signed November 11, 1918, * * * or which were acquired by or are in the possession of the United States * * * by reason of its participation in the war or to which its nationals have thereby become rightfully entitled; or which, under the treaty of Versailles, have been stipulated for its or their benefit; or to which it is entitled as one of the principal allied and associated powers; or to which it is entitled by virtue of any act or acts of Congress; or otherwise."

It is thus seen that the Treaty between the United States and Germany specifically accorded to the United States all the rights and advantages stipulated for the benefit of the United States in the Treaty of Versailles. And an examination of the latter treaty shows it provided that "Germany undertakes to compensate her nationals in respect of the sale or retention of their property, rights or interests in Allied or Associated States." Article 297, (2), (i). It shows, further, that there was reserved to the United States, being one of the Allied Powers, "the right to retain and liquidate all property, rights and interests belonging * * * to German nationals or companies controlled by them." It also declared that "all exceptional war measures, or measures of transfer, or acts done or to be done in execution of such measures, * * * shall be considered as final and binding upon all persons." It declared, too, that all orders or decisions of any department of the government, made or given, or purporting to be made or given, in pursuance of war legislation with regard to enemy property rights or interests, is confirmed and that every action taken with regard to any such property is confirmed. It added:

"No question shall be raised as to the regularity of a transfer of any property, rights or interests dealt with in pursuance of any such order, direction, decision or instruction." It defined measures of transfer as "those which have affected or will affect the ownership of enemy property by transferring it in whole or in part to a person other than the enemy owner, and without his consent, such as measures directing the sale, liquidation, or devolution of ownership in enemy property, or the canceling of titles or securities." And it expressly declared in article 297, paragraph (b), that "the property, rights, and interests of German nationals will continue to be subject to exceptional war measures that have been or will be taken with regard to them."

The Constitution, in article 6, declares that all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and all judges are bound thereby.

The complainant, a German national, is in the courts of the United States seeking to assert that a transfer, made by the Alien Property Custodian to this respondent pursuant to an act of Congress concerning the property rights of an alien enemy, were ineffective as against it, and that it can reclaim the property. But under the treaty it has no such right. Germany has assumed the obligation of compensating her own nationals "or companies controlled by them in respect of the sale or retention of their property, rights or interests" in this country at the close of the war. It has acknowledged the right of the United States to retain and liquidate all property, rights, and interests within this country at the date of the treaty and belonging "to German nationals or companies controlled by them." It has agreed that "as between the Allied and Associated Powers or their nationals on the one hand and *Germany or her nationals* on the other hand, all the exceptional war measures, or measures of transfer, or acts done *or to be done* in execution of such measures, * * * shall be considered as *final and binding upon all persons.* * * *"

At the time the Alien Property Custodian seized the stock of the complainant, such complainant was an alien enemy, and its property within the United States was subject to seizure and to such disposition as Congress directed. During the continuance of the war, the complainant, being an enemy alien, could not have been heard to complain. After the war was ended by the treaty of peace, whatever right the complainant pos-

sessed in the property seized and disposed of was subject to the provisions of the treaty. Those provisions clearly contemplate that no question shall be raised by a German national in the courts of the United States as to the regularity or validity of the proceedings taken by the Alien Property Custodian in the sale and transfer of any property rights or interest owned by a German national and dealt with as enemy property under the war legislation of Congress. The treaty, in our opinion, bars the assertion in our courts of any such claim as that put forward by the complainant herein. See Lange v. Wingrave (D. C.) 295 F. 565; United States v. Chemical Foundation (D. C.) 294 F. 300; Junkers v. Chemical Foundation (D. C.) 287 F. 597, 598.

[5] It is said that the retrocession agreements which were in existence prior to April 1, 1917, were not terminated by the declaration of war, and that the Trading with the Enemy Act expressly permitted the continuance of insurance and reinsurance contracts. The complainant relies upon Kershaw v. Kelsey, 100 Mass. 561, 97 Am. Dec. 124, 1 Am. Rep. 142, which has long been regarded as a leading case. The opinion in that case was written by Mr. Justice Gray (afterwards of the Supreme Court of the United States), and it reviews at great length the authorities, beginning with the judgment of Sir William Scott with the famous case of The Hoop, 1 C. Rob. 196.

In his opinion in the Kershaw Case Mr. Justice Gray, at pages 572, 573, said: "The result is that the law of nations, as judicially declared, prohibits all intercourse between citizens of the two belligerents which is inconsistent with the state of war between their countries, and that this includes any act of voluntary submission to the enemy, or receiving his protection, as well as any act or contract which tends to increase his resources, and every kind of trading or commercial dealing or intercourse, whether by transmission of money or goods, or orders for the delivery of either, between the two countries, directly or indirectly, or through the intervention of third persons or partnerships, or by contracts in any form looking to or involving such transmission, or by insurances upon trade with or by the enemy. Beyond the principle of these cases the prohibition has not been carried by judicial decision."

The doctrine above stated is in harmony with the decisions of the Supreme Court of the United States. Scholefield v. Eichelberger, 7 Pet. 586, 8 L. Ed. 793; Coppell v.

Hall, 7 Wall. 542, 554, 19 L. Ed. 244; United States v. Quigley, 103 U. S. 595, 26 L. Ed. 524; Carson v. Dunham, 121 U. S. 421, 7 S. Ct. 1030, 30 L. Ed. 992; The Rapid, 8 Cranch, 155, 3 L. Ed. 520; Conrad v. Waples, 96 U. S. 279, 287, 24 L. Ed. 721; Briggs v. United States, 143 U. S. 346, 12 S. Ct. 391, 36 L. Ed. 180. In Conrad v. Waples, supra, the Supreme Court said: "It was commercial intercourse and correspondence between citizens of one belligerent and those of the other, the engaging in traffic between them, which were forbidden by the laws of war and by the President's proclamation of non-intercourse. So long as the war existed, all intercourse between them inconsistent with actual hostilities was unlawful."

The court in Insurance Co. v. Davis, 95 U. S. 425, 429 (24 L. Ed. 453), said: "That war suspends all commercial intercourse between the citizens of two belligerent countries or States, except so far as may be allowed by the sovereign authority, has been so often asserted and explained in this court, within the last 15 years, that any further discussion of that proposition would be out of place. As a consequence of this fundamental proposition, it must follow that no active business can be maintained, either personally or by correspondence, or through an agent, by the citizens of one belligerent with the citizens of the other."

And in Williams v. Paine, 169 U. S. 55, 70, 18 S. Ct. 279, 285 (42 L. Ed. 658), the court declared: "Certain kinds of agencies are undoubtedly revoked by the breaking out of hostilities. Agents of an insurance company, it is said, would come within that rule. Insurance Company v. Davis, 95 U. S. 425, 429 [24 L. Ed. 453]. * * * It is easy to see that active and continuous business of such a nature could not be carried on during a war where the principal and the agent reside in the different countries engaged in such war."

The Trading with the Enemy Act, while making trading with the enemy unlawful, extended certain privileges in relation to patents, trade-marks, and copyrights. And section 4 of the act made special provision regarding "every enemy insurance or reinsurance company" doing business within the United States through an agency or branch office, or otherwise. It provided that every such company might, within 30 days after the passage of the act, apply to the President for a license "to continue to do business." It gave authority to the President to enter an order granting or refusing to grant such license for such period and on such condi-

tions as the President determined. The Trading with the Enemy Act permitted the continuance of the insurance business if a license from the President was obtained. This complainant, however, applied for no license and obtained none.

Moreover, in the argument in this court and in its brief, the complainant admitted that the licenses which were issued were nothing more than liquidating licenses, which prevented the German companies from making other and new contracts of insurance with American companies and American citizens. It conceded that they simply permitted the German companies to collect their premiums and pay their losses upon existing business. In this connection we may repeat what was said by this court in Garvan v. $20,000 Bonds, 265 F. 477, 478: "The President, through the Secretary of the Treasury, issued licenses to the companies in question, not to continue to do business in the United States, but for the purpose of being liquidated."

[6] The complainant also bases its claim to do business in this country on the President's proclamation of April 6, 1917, which, in its essential provisions, is as follows:

"Whereas, certain insurance companies, incorporated under the laws of the German Empire, have been admitted to transact the business of insurance in various states of the United States, by means of separate United States branches established pursuant to the laws of such states, and are now engaged in business under the supervision of the insurance departments thereof, with assets in the United States deposited with insurance departments or in the hands of resident trustees, citizens of the United States, for the protection of all policy holders in the United States: * * *

"Now, therefore, I, Woodrow Wilson, President of the United States of America, by virtue of the powers vested in me as such, hereby declare and proclaim that such branch establishments of German insurance companies now engaged in the transaction of business in the United States pursuant to the laws of the several states are hereby authorized and permitted to continue the transaction of their business in accordance with the laws of such states in the same manner and to the same extent as though a state of war did not now exist. * * * *"

40 Stat. pt. 2, p. 1654.

The above proclamation deals exclusively with United States branches of German companies established pursuant to the laws of the various states of the United States and having assets in the United States deposited with insurance departments, or in the hands of resident trustees, citizens of the United States, for the protection of policy holders. It certainly did not, as is claimed, permit German insurance companies of "all classes" to continue their business as though a state of war did not exist.

There is no allegation in the pleadings that the treaties between complainant and respondent were with the United States department of the complainant company. In the complaint it is alleged that the complainant had a United States branch, and that complainant had agreements with respondent which were not in any way related to the business of complainant's United States branch. In the absence of any allegation that the treaties and contracts, in existence between complainant and respondent prior to the making of the agreement of March 31, 1917, were with complainant's United States branch or department, the complainant cannot support its argument that because of the President's proclamation it had the right to continue its business in the United States, "just as though no state of war existed."

It appears that subsequent to April 1, 1917, the respondent incurred and paid losses on reinsurances under the treaty with the Home Insurance Company, which had been retroceded to the complainant prior to the aforesaid date, and that, for reasons which need not be set forth herein, the amount of the complainant's liability on the reinsurances so retroceded to it was not determined until January, 1921; that these losses were paid by the respondent, and were chargeable against the complainant, because of cessions to it prior to April 1, 1917, the premiums for which had in regular course been received by it.

[7] The Alien Property Custodian, in liquidating the affairs of the complainant, had the respondent's claim before him for reimbursement in the amount the respondent had paid under the treaty with the Home Insurance Company after April 1, 1917. After hearings on that claim the Custodian allowed it in the sum of $54,002.72, and paid to the respondent that amount, less the sum of $4,669.64 due to the complainant on the same account, making the balance paid by him to the respondent in full settlement of the claim of $49,333.12. This amount the complainant asks the court to direct the respondent to pay over to it.

In view of the agreement made by these parties on March 31, 1917, and heretofore referred to, it is not important to the deci-

sion of the question now before the court to determine what effect the declaration of war had upon the contracts which at that time existed between them. In 3 Williston on Contracts, § 1748, it is said that "existing contracts between domestic citizens and enemy aliens, which were entered into before war broke out and which were valid at that time, are either suspended or terminated by a declaration of war. They are merely suspended if the delay in performance caused by the war is not so great as materially to affect the burden of the contract, but otherwise they are terminated."

The contract of March 31, 1917, was neither suspended nor terminated by the declaration of war. At the time Congress declared war the contract of March 31st was an executed, and not an executory, contract. It had already operated to cancel all retrocessions, contracts, and agreements between the complainant and respondent, and the respondent had taken over and acquired the full beneficial interest in each of the treaties and contracts of reinsurance then in force between the respondent and the American and Canadian companies. There remained, however, certain losses which had already occurred, and for which the complainant was bound, but which had not at that time been ascertained, and for which no payment had been made by the complainant to the respondent. When these losses were paid by the respondent to the Home Insurance Company, the complainant, which had received the premiums on the policies, became indebted to the respondent in the amount so paid. The war did not cancel that debt, and under the legislation of Congress, authorizing the Custodian to pay claims due from an enemy out of the proceeds realized from the sale of that enemy's property, the respondent's claim was presented and paid.

We understand that it is claimed by the complainant that the presentation of this claim to the Custodian operated to rescind the agreement of March 31, 1917. We are at a loss to see any basis whatever for such a contention, and our attention has not been called to any provision in that agreement which gives either to complainant or to respondent an option to rescind. Neither has our attention been called to any proposition of law, and we know of none, which lends countenance to the suggestion that the agreement was rescinded by the presentation of the claim.

[8] The Custodian seized on March 13, 1918, the shares of stock which the complainant then owned in the respondent company.

The old certificates were canceled and new certificates issued therefor. The sale of this stock was not made by the Custodian until March, 1920. At the time of the sale the Custodian was acting under the act of 1918, the provisions of which, hereinbefore set forth, clothed him with all the powers of absolute ownership. The purchaser of the shares obtained all the right, title, and interest that the complainant had in the stock. The complainant not only had no interest in the stock, but it had no interest in the proceeds realized from the sale of the stock. From the time the stock was seized and taken into the Custodian's possession, the title to the stock passed to the Custodian, and when the latter, as owner, sold it, the proceeds of the sale passed to the Custodian, as trustee for the United States, to be dealt with as the United States, as owner, might determine. The complainant could not reclaim the stock from the purchaser. Neither could it reclaim the proceeds of the sale. Neither was it interested in the use to which Congress devoted them.

[9] It was argued by complainant's counsel that the Trading with the Enemy Act did not contemplate confiscation of enemy owned property but provided for custodianship only. There is support for this contention in section 9 of the act of 1917, which permitted payment of claims with "the assent of the owner" of the property seized. But the act of 1918, amending the former act, gave the Custodian the powers of an absolute owner. We have already expressed our opinion that the power exists in Congress to confiscate the property of the subjects of an enemy found in the United States in time of war. Whether Congress intended to exercise the power in the act of 1917, and the amendatory act of 1918, is another question. Blackstone, in 1 Comm. 299, speaks of bona confiscata (confiscated goods) being so called "because they belong to the fiscus or imperial treasury, or, as our lawyers term them, forisfacta; that is, such whereof the property is gone away or departed from the owner." From what has already been said it appears that the United States, through the Custodian, seized the enemy property of the complainant which was within the United States, sold it, and adjusted claims against it, and then deposited the balance in the Treasury of the United States, and the whole was done in accordance with the legislation of Congress.

In Halsey v. Lowenfeld, [1916] 2 K. B., 707, 713, Lord Chief Justice Reading said: "The property of alien enemies is at common law subject to confiscation by the crown in

virtue of the royal prerogative. See Hale's Pleas of the Crown, vol. 1, p. 95; Porter v. Freudenberg, [1915] 1 K. B., 857, 867."

Chief Justice Marshall, in 1814, writing for the Supreme Court, in Brown v. United States, 8 Cranch, 110, 122 (3 L. Ed. 504), said: "Respecting the power of government no doubt is entertained. That war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found, is conceded. The mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself. · That remains undiminished, and when the sovereign authority shall choose to bring it into operation, the judicial department must give effect to its will."

In Hanger v. Abbot, 6 Wall. 532, 536 (18 L. Ed. 939) Mr. Justice Clifford, writing for the Supreme Court in 1867, said: "In former times the right to confiscate debts was admitted as an acknowledged doctrine of the law of nations, and in strictness it may still be said to exist; but it may well be considered as a naked and impolitic right, condemned by the enlightened conscience and judgment of modern times."

Under section 6 of the act of 1917 the Custodian was bound "to hold, administer and account" for the property "due or belonging to an enemy," which came into his possession and any transfer of money or property to the Custodian, in accordance with the provisions of the act, was made by section 7 (e), being Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d, "a full acquittance and discharge for all purposes of the obligation of the person making the same to the extent of the same." And in section 12 of the act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff) it was provided that "after the end of the war any claim of any enemy or of an ally of enemy to any money or other property received and held by the alien property custodian or deposited in the United States Treasury, shall be settled as Congress shall direct." And Congress has not yet "directed" repayment to enemies for property which the United States took into its possession prior to the peace.

We are familiar with what many of the judges of the United States have said as to the confiscation of the property of enemies and the injustice which it involves. See Ware v. Hylton, 3 Dall. 199, 254, 281, 1 L. Ed. 568; Brown v. United States, 8 Cranch, 110, 123, 3 L. Ed. 504; United States v. Percheman, 7 Pet. 51, 86, 87, 8 L. Ed. 604.

Confiscation is undoubtedly a harsh exercise of the rights of war. But, as the right exists, whether it shall be exercised depends solely upon Congress, and not upon the courts. What the direction of Congress ultimately will be as to the relief to be extended to the enemy owners of seized property is not a question upon which the courts have any need to speculate. The fact that by the Treaty it is agreed between the United States and Germany that each nation will pay the claims of its own nationals indicates that the owners of property seized as belonging to an enemy are not left remediless, and that their losses are to be repaid.

Decree affirmed.